UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE SUBPOENA DUCES TECUM NO. 25-1431-016 | CASE NO. 2:25-mc-00041-JHC *SEALED* |
| | ORDER GRANTING MOTIONS TO SET ASIDE SUBPOENA AND TO SEAL DOCKET |

**I**
**INTRODUCTION**

This matter comes before the Court on Seattle Children's Hospital's Motions to Set Aside or Modify Subpoena, Dkt. # 1, and to Seal Docket, Dkt. # 4. The Court has reviewed the materials filed in support of and in opposition to the motions, the record, and the governing law. Being fully advised, and for the reasons below, the Court GRANTS the motions.

**II**
**BACKGROUND**

On January 28, 2025, President Donald Trump issued Executive Order 14187, titled "Protecting Children From Chemical and Surgical Mutilation" (the EO). Dkt. # 2-1 at 30. The EO orders:

Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end. . .

Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called "transition" of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures.

*Id.*

The EO defines "chemical and surgical mutilation" as (1) "the use of puberty blockers . . . to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex"; (2) "the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex"; and (3) "surgical procedures" related to "gender affirming care." *Id.* The EO orders agencies providing research or education grants to medical institutions to "take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." *Id.* at 31. It also orders the Attorney General to, as pertinent here:

prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation.

*Id.*

On April 22, 2025, Attorney General Pamela Bondi issued a memorandum titled, "PREVENTING THE MUTILATION OF AMERICAN CHILDREN" (the Bondi Memo). *Id.* at 43. It describes the "radical ideological agenda" of "teach[ing] children to deny biological reality" and, pursuant to the EO, issues "guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents." *Id.* at 43, 45. As pertinent here, it provides:

The Department of Justice will investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations. To that end:

- I am directing the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." Even if otherwise truthful, the promotion of off-label uses of hormones—including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses—run afoul of the FDA's prohibitions on misbranding and mislabeling. [citing 21 U.S.C. §§ 321 (m)-(n), 331, 352(a), (f); 21 C.F.R. §§ 201.100, 201.128, 202.1(l)(2).]

*Id.* at 46. The memo concludes that the Department of Justice (DOJ) will bring "to an end" practices related to "gender-affirming care." *Id.* at 48.

On June 11, 2025, Assistant Attorney General Brett Shumate issued a memorandum to all employees of the DOJ's Civil Division titled "Civil Division Enforcement Priorities." *Id.* at 50. After referring to the EO and the Bondi Memo, it states:

The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food, Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq.*

*Id.* at 51–52.

That same day, Shumate issued a subpoena to Seattle Children's Hospital, the largest provider of pediatric services in the Pacific Northwest. *Id.* at 2; Dkt. # 3 at 3, ¶ 8. Seattle Children's cares for patients diagnosed with gender dysphoria. Dkt. # 3 at 4–6. The subpoena contains 15 requests, which Seattle Children's summarizes into four categories:

1. *Personnel files*: Personnel files for all Hospital executives, management employees, or board members; employees with authority to prescribe medications or perform medical evaluations; and employees engaged in billing activities (Request 1).

2. *Patient information and medical records*: Documents sufficient to identify every patient prescribed puberty blockers or hormone therapy (by name, date of birth, SSN number, address, and parent/guardian information); for each such patient, all documents related to clinical indications, diagnoses, or assessments that formed the basis for the prescription; all documents relating to informed consent, intake, and parent/guardian authorization; and all documents related to adverse events, side effects, or medically unfavorable consequences (Requests 11-13, 15).

3. *Billing information*: All documents related to billing, insurance claims, and diagnosis codes related to gender-related care, and all other diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (Requests 2-6).

4. *Information regarding pharmaceutical companies and government agencies*: Communications with and documents received from or related to pharmaceutical companies providing puberty blockers or hormones for gender-related care; communications with government agencies related to the safety of puberty blockers or hormones for minor patients (Requests 7-10, 14).

Dkt. # 1 at 9 (citing Dkt. # 2-1 at 8–10).

On July 1, 2025, counsel for Seattle Children's met with DOJ attorneys to discuss the subpoena. Dkt. # 2 at 2, ¶ 3. According to a declaration by one of the attorneys representing Seattle Children's, the DOJ attorneys explained that the DOJ issued the subpoena because of the EO and the Bondi Memo. *Id.* at 2, ¶ 4a. They said that the subpoena was not prompted by any specific allegations about Seattle Children's, nor were they aware of any allegation that Seattle Children's had made a false or misleading statement. *Id.* at 3, ¶ 4e. They said that the DOJ issued the subpoena because it knows that Seattle Children's provides gender-related care for minors and thus, in its view, the hospital might have information relating to an investigation. *Id.* The DOJ had not yet determined whether the investigation is civil or criminal. *Id.* at 2, ¶ 4c.

The DOJ issued the subpoena under 18 U.S.C. § 3486(a)(1)(A)(i)(I). Dkt. # 2-1 at 2. Seattle Children's moves to set aside or modify the subpoena under 18 U.S.C. § 3486(a)(5).[1]

### III
### DISCUSSION

A.     Motion to Set Aside or Modify Subpoena

    1.     Standards of review

"The scope of the judicial inquiry in an . . . agency subpoena enforcement proceeding is quite narrow." *United States v. Exxon Mobil Corp.*, 943 F.3d 1283, 1287 (9th Cir. 2019) (quoting *E.E.O.C. v. Fed. Exp. Corp.*, 558 F.3d 842, 848 (9th Cir. 2009)). In assessing administrative subpoenas, courts in the Ninth Circuit ask "(1) whether Congress has granted the authority to investigate; (2) whether procedural requirements have been followed; and (3) whether the evidence is relevant and material to the investigation." *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1113 (9th Cir. 2012) (quotation marks and citations omitted). These factors reflect a Fourth Amendment reasonableness inquiry.[2]

---

[1] This subsection provides, "At any time before the return date specified in the summons, the person or entity summoned may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons, or a prohibition of disclosure ordered by a court under paragraph (6)."

[2] In *Golden Valley Elec. Ass'n*, the Ninth Circuit explained that even if the three factors discussed above are met, "a Fourth Amendment 'reasonableness' inquiry must also be satisfied." 689 F.3d at 1113 (quoting *Reich v. Mont. Sulphur & Chem. Co.*, 32 F.3d 440, 444 n.5 (9th Cir. 1994)). But such an inquiry need not be separate because the Ninth Circuit's three-factor test reflects the Fourth Amendment reasonableness inquiry.

The Ninth Circuit articulated its three-factor test in *E.E.O.C. v. Children's Hosp. Med. Ctr. of N. California*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc), *overruled on other grounds as recognized in Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1303 (9th Cir. 1994). In *Children's Hosp.*, the Ninth Circuit relied on several Supreme Court decisions that the Sixth Circuit has, in the context of reviewing another subpoena issued under 18 U.S.C. § 3486, summarized to adopt a similar test based on Fourth Amendment principles that asks whether a subpoena (i) is authorized by statute; (ii) seeks relevant documents; (iii) seeks information not already in the agency's possession; and (iv) will, if enforced, be an abuse of the court's process. *See Doe v. United States*, 253 F.3d 256, 262–65 (6th Cir. 2001). And in *Golden Valley Elec. Ass'n*, the Ninth Circuit explained that "[a]n administrative subpoena is consistent with the Fourth Amendment if 'the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry.'" 689 F.3d at 1115 (quoting *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946)).

The agency must make a prima facie showing that these requirements have been met. *See F.D.I.C. v. Garner*, 126 F.3d 1138, 1142–43 (9th Cir. 1997). An affidavit from a government official suffices to do so. *Id.* If these requirements are met, the burden shifts to the recipient of the subpoena to "disprove" the agency's showing. *United States v. Tan*, 16 F.4th 1346, 1352–53 (9th Cir. 2021). The recipient of the subpoena may also show that enforcement of the subpoena would be an abuse of the court's process. *Crystal v. United States*, 172 F.3d 1141, 1143–44 (9th Cir. 1999) (citing *United States v. Powell*, 379 U.S. 48, 57–58 (1964)). The Court discusses the precise burden *infra* Section III.A.3.c.(1). Ultimately, the recipient of the subpoena bears the burden of showing that the subpoena is unlawfully issued or that its enforcement would be an abuse of the court's process; the agency does not bear the burden of proving that the subpoena is lawfully issued. *See Crystal*, 172 F.3d at 1144 & n.3 (declining to follow dicta in *United States v. Gertner*, 65 F.3d 963 (1st Cir. 1995)).

In reviewing a subpoena issued, as here, under 18 U.S.C. § 3486, the Eighth Circuit has applied a similar standard:

> It is well established that a subpoena is properly enforced if (1) issued pursuant to lawful authority, (2) for a lawful purpose, (3) requesting information relevant to the lawful purpose, and (4) the information sought is not unreasonable. If an agency has satisfied these requirements for an administrative subpoena, the burden shifts to the respondent to show that judicial enforcement would amount to an abuse of the court's process.

*United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012) (quotation marks and citations omitted).

A point of semantic distinction—which does not make a legal difference—is that the Eighth Circuit assesses whether the subpoena is issued "for a lawful purpose." *Id.* The Ninth Circuit has summarized its three-factor test as follows: "courts must enforce administrative subpoenas unless the evidence sought by the subpoena [is] plainly incompetent or irrelevant to

*any lawful purpose* of the agency." *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001) (quotation marks and citations omitted) (emphasis added). And in the context of Internal Revenue Service (IRS) summons, the Ninth Circuit, quoting *Powell*, 379 U.S. at 57–58, has held that "the IRS must establish that the summons (1) was issued pursuant to a 'legitimate purpose'; (2) seeks information 'relevant' to that purpose; (3) seeks information that is 'not already within the Commissioner's possession'; and (4) satisfies all 'administrative steps required by the Code.'" *Stewart v. United States*, 511 F.3d 1251, 1254 (9th Cir. 2008). The Ninth Circuit has applied the criteria set forth in *Powell* to administrative summonses issued by agencies other than the IRS. *See Tan*, 16 F.4th at 1353. And these criteria do not materially differ from those assessed under the Ninth Circuit's three-factor test. In fact, the Ninth Circuit relied on *Powell* in setting forth this test. *See Children's Hosp.*, 719 F.2d at 1428. Thus, the Court assesses whether the purpose for which the subpoena was issued is lawful and discusses how it can be considered under the three-factor test *infra* Section III.A.3.c.(1).

       2.     Procedural requirements

      The DOJ makes a prima facie case that it has complied with the procedural requirements. The DOJ issued its subpoena under 18 U.S.C. § 3486(a)(1)(A)(i)(I), which authorizes the Attorney General to issue a subpoena in an investigation of "a Federal health care offense," defined in § 24(a). In its opposition to the motion to set aside or modify the subpoena, the DOJ says that the Attorney General delegated authority to Shumate to issue the subpoena to investigate "among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act ('FDCA')." Dkt. # 18 at 1, 3 & n.2. In support of this proposition, the DOJ offers only a declaration by Lisa Hsiao, Acting Director of the DOJ's

Consumer Protection Branch, in which she cites 28 U.S.C. § 510, a statute generally authorizing the Attorney General to delegate authority.  Dkt. # 18-1 at 3, ¶ 4.  Hsiao also declares:

> Pursuant to Attorney General Order Number 3591-2015, dated November 10, 2015, the Attorney General authorized the Assistant Attorney General for the Civil Division to issue and serve administrative subpoenas pursuant to 18 U.S.C. §§ 3486(a)(1)(A) and (a)(1)(B) to investigate violations of the FDCA that relate to a health care benefit program.

*Id.* at 3, ¶ 5.

The DOJ does not provide Attorney General Order Number 3591-2015.  And it is unclear whether investigation of off-label promotion or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors "relate[s] to a health care benefit program." *Id.*  The Bondi Memo, however, directs "the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the [FDCA]," which Seattle Children's does not dispute are federal healthcare offenses under 18 U.S.C. § 3486.  Dkt. # 2-1 at 46.  Although the DOJ could make a stronger showing that the Attorney General delegated authority to issue the subpoena, it need carry only a "slight" burden to make its prima facie case.  *Crystal*, 172 F.3d at 1144 (quoting *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1414 (9th Cir. 1993)).  Hsiao's declaration, along with the Bondi Memo, suffice to carry this minimal burden.  *See Tan*, 16 F.4th at 1352 (a declaration can make a prima facie case for enforcement).

Seattle Children's does not carry its burden to show otherwise.  It points to a section of the DOJ's Justice Manual titled, "Overview of Authorized Investigative Demands – Delegation," which provides:

> The Attorney General's authority to issue investigative demands pursuant to 18 U.S.C. § 3486 has been delegated, with authority to redelegate, to the following officials:
>
> 1.  Each United States Attorney;
>
> 2.  The Assistant Attorney General for the Criminal Division.

U.S. Department of Justice, Justice Manual 9-44.201. Seattle Children's contends that Shumate has not been delegated authority to issue a subpoena under 18 U.S.C. § 3486 because he is part of the Civil Division. But Seattle Children's does not show that this provision of the Justice Manual is an exclusive list of individuals to whom the Attorney General has delegated such authority. Thus, the Court cannot conclude that Seattle Children's has carried its burden to refute the DOJ's prima facie case that the subpoena met procedural requirements.[3] The DOJ's thin prima facie case for its compliance with procedural requirements, however, suggests that the purpose of its investigation is unclear – an issue to which the Court now turns.

### 3. Purpose of the investigation

The Court considers the purpose of the DOJ's investigation in assessing the first factor of "whether Congress has granted the authority to investigate." *Golden Valley Elec. Ass'n*, 689 F.3d at 1113. As an initial matter, the DOJ contends that courts cannot review the purpose for which a subpoena is issued. *See* Dkt. # 18 at 4. But in support of this contention, the DOJ cites *Whispering Oaks*, which holds to the contrary. 673 F.3d at 817; *see supra* Section III.A.1. The thrust of the DOJ's contention, rather, appears to be that the scope of such review is limited. Thus, the Court begins by discussing the applicable standard before applying it to the DOJ's subpoena.

### a. "Realistic expectation" standard

To make its prima facie case that Congress has granted it authority to issue its subpoena, the DOJ must demonstrate that it has a realistic expectation that it might discover something relevant to its investigation. In *Whispering Oaks*, the recipient of the subpoenas (Whispering

---

[3] Seattle Children's also points out that the DOJ has not formally moved to compel enforcement of its subpoena. *See* 18 U.S.C. § 3486(c); Dkt. # 22 at 7. Because the Court grants Seattle Children's motion to set aside the subpoena, it need not reach this issue.

Oaks), asserted that the subpoenas were issued for the improper purpose of harassment "because of unspecified political or racial animus" and that the district court erred by not "requiring the Government to present evidence of a 'reasonable suspicion' that the law had been violated." 673 F.3d at 817–18. The Eighth Circuit rejected this assertion:

> Whispering Oaks cites no legal authority for requiring the Government to justify its administrative subpoenas by revealing the identity of any informants, the information those informants may have provided, or any other facts revealing the motives behind a lawful investigation. The Government, with its subpoena power, "does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."

*Id.* at 818 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)).

Agencies need not show probable cause to justify a subpoena. *Golden Valley Elec. Ass'n*, 689 F.3d at 1115. But agencies must make some prima facie showing of reasonableness. *See id.* at 1115–16; *Oklahoma Press Pub. Co.*, 327 U.S. at 208 ("The gist of the [Fourth Amendment's] protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable."). The DOJ acknowledges as much, observing that courts have reviewed "whether the subpoena is not actually attempting to obtain evidence in furtherance of an investigation of potential federal offenses." Dkt. # 18 at 5.

Thus, the Supreme Court's language in *Morton Salt Co.* that an agency can investigate "even just because it wants assurance" that the law is not being violated cannot be read so expansively as to mean that an agency can make a prima facie case for enforcement with mere speculation of unlawful conduct. The language must be taken in context:

> [An administrative agency] has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

*Morton Salt Co.*, 338 U.S. at 642–43. The Supreme Court made this statement in analogizing administrative agencies to grand juries. It did not set forth a general rule as to what an agency must show to make a prima facie case that its subpoena is valid. Nor could it, because a particular statute governs the scope of an agency's authority to issue a subpoena. *See Peters v. United States*, 853 F.2d 692, 696, 699 (9th Cir. 1988) (observing that "[t]he authority of an administrative agency to issue subpoenas for investigatory purposes is created solely by statute" and disapproving "imputations of power from one agency to an entirely different agency").

The Ninth Circuit has thus given broad effect to this passage in *Morton Salt Co.* in cases involving statutes that confer an agency capacious authority to issue a subpoena. *See, e.g.*, *id.* at 695–96. For example, in *Reich*, the Occupational Safety & Health Administration (OSHA) received an employee complaint that a company did not x-ray its welds or certify its welders. 32 F.3d at 442. OSHA then issued a subpoena for documents about, among other things, welding procedures. *Id.* at 442–43 & n.3. On appeal, the company contended that OSHA must identify a specific regulation that might be violated. *Id.* at 444. And even if the subpoena could be enforced, the company contended that the request must be limited to the scope of the employee complaint. *Id.* at 445. The Ninth Circuit rejected these contentions and affirmed enforcement of the subpoena because the Occupational Safety and Health Act confers broad authority for OSHA to seek documents "related to whether the employer was 'furnishing to its employees . . . a place of employment which [is] free from recognized hazards that are causing or likely to cause death or serious physical harm.'" *Id.* at 444–46 (citing, among other authorities, 29 U.S.C. § 654(a)(1)). In so holding, the Ninth Circuit distinguished subpoenas issued by the Equal Employment Opportunity Commission (EEOC) because "[t]he EEOC's authorizing statute specifically limits its subpoenas to the investigation of discrete charges." *Id.* at 446 (citing *U.S.*

*E.P.A. v. Alyeska Pipeline Serv. Co.*, 836 F.2d 443, 447 (9th Cir. 1988), *abrogated on other grounds by McLane Co. v. E.E.O.C.*, 581 U.S. 72, 80–81 (2017)).

Although 18 U.S.C. § 3486(a)(1)(A)(i)(I) does not require subpoenas to be related to a discrete *charge*, it requires subpoenas to be related to the investigation of "a Federal health care offense," defined in § 24(a). Thus, the statute is more like—but still narrower than—Section 7602(2) of the Internal Revenue Code of 1954, which was at issue in *Powell* and which provides:

> For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—
>
> > (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;
> >
> > (2) To summon the person liable for tax or required to perform the act . . . to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry,

379 U.S. at 49, 53 & n.12.

"As stated in [*Powell*], the required standard that the IRS must meet is clearly less than probable cause." *United States v. Goldman*, 637 F.2d 664, 667 (9th Cir. 1980). Although the applicable standard is difficult to articulate, one way is to ask "whether the inspection sought might have thrown light on the correctness of the taxpayer's return." *Id.* (citations omitted). The Second Circuit elaborated that "the 'might' in the articulated standard 'might throw light upon the correctness of the return,' is in the particular circumstances *an indication of a realistic expectation rather than an idle hope that something may be discovered*." *Id.* (quoting *United States v. Harrington*, 388 F.2d 520, 524 (2d Cir. 1969)) (emphasis added). The Ninth Circuit has favorably quoted this standard, *id.*, and it tracks the Supreme Court's recognition that "[i]t is contrary to the first principles of justice to allow a search through all [of a party's] r[e]cords,

relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924). Although the DOJ need not allege a federal healthcare offense, it must at least show that it has a realistic expectation rather than merely an "idle hope" that something supporting such unlawful activity might be discovered in its investigation. *Goldman*, 637 F.2d at 667 (citation omitted).

This also accords with the Ninth Circuit's emphasis that a court must enforce a subpoena unless "the agency's jurisdiction is plainly lacking." *Karuk Tribe Hous. Auth.*, 260 F.3d at 1077 (quotation marks and citation omitted). In *Karuk Tribe Hous. Auth.*, the Ninth Circuit reiterated, "[A] party may not defeat agency authority to investigate with a claim that could be a defense if the agency subsequently decides to bring an action against it." *Id.* at 1076 (quoting *Children's Hosp.*, 719 F.2d at 1429). For example, a court cannot quash a subpoena based on a contention that turns on the merits of the investigation or, for example, that res judicata applies. *Id.* at 1075–76. A court can, however, quash a subpoena if the defense is "'jurisdictional' in nature— i.e., when the agency lacks jurisdiction over the subject of the investigation." *Id.* at 1077.

Thus, a court can set aside a subpoena if the agency does not carry its light burden of showing that the subpoena is issued within the authority conferred to the agency by Congress. After all, the anchor of the court's inquiry is the investigation. *See Fed. Exp. Corp.*, 558 F.3d at 855 ("Thus, the subpoena seeks information relevant and material *to the investigation*.") (quotation marks and citation omitted). Although the DOJ need not define the contours of its investigation, it must convince the court that there is *some* investigation that allows it to issue a subpoena. Without such minimal evidence, the Court cannot enforce the subpoena because it is "too indefinite or broad" to be enforced. *Golden Valley Elec. Ass'n*, 689 F.3d at 1113 (quoting *Peters*, 853 F.2d at 699); *see also In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (reversing in part enforcement of a subpoena issued for the general purpose of

uncovering "other wrongdoing, as yet unknown" because "the broad language used to describe this purpose makes it impossible to apply [the relevant standard]").

          b.  Prima facie case

The DOJ does not make a prima facie showing that its subpoena is authorized by Congress because it does not establish that it has a realistic expectation of discovering something relevant to the investigation of a federal healthcare offense. The DOJ's "burden, while not great, is also not non-existent." *Goldman*, 637 F.2d at 667. Compared to the IRS's burden to issue a summons, the DOJ's burden here is slightly heavier because 18 U.S.C. § 3486(a)(1)(A)(i)(I) is more restrictive than the provisions of the Internal Revenue Code such as that at issue in *Powell*. *See Liberty Fin. Servs. v. United States*, 778 F.2d 1390, 1392 (9th Cir. 1985) (the burden to make a prima facie case is "minimal" in the context of an IRS summons "because the statute must be read broadly in order to ensure that the enforcement powers of the IRS are not unduly restricted"). In any event, the DOJ's evidence is threadbare. The DOJ provides only Hsiao's declaration that the subpoena to Seattle Children's "was lawfully issued and authorized by Brett A. Shumate, Assistant Attorney General for the Civil Division in connection with a valid investigation being conducted in my office."[4] Dkt. # 18-1 at 3, ¶ 6.

Although it is a close question, this conclusory statement is insufficient. The Ninth Circuit has affirmed enforcement of a subpoena in cases involving more than a bare assertion that an investigation exists.[5] For example, in *Golden Valley Elec. Ass'n*, the Ninth Circuit

---

    [4] Although the DOJ provides other justifications for its subpoena in its briefing, it cites no case (and the Court could not find any) suggesting that the Court can consider justifications made in a brief to determine whether an agency has made a prima facie case for enforcement of a subpoena. Thus, the Court does not consider these justifications here, but does so below in reasoning that even if the DOJ had made its prima facie case, Seattle Children's has sufficiently shown that the subpoena was issued for an improper purpose.

    [5] Other circuits are in accord. For example, the Seventh Circuit concluded that the IRS made its prima facie case with an affidavit in which the revenue agent conducting the audit "declared that the IRS

affirmed a district court's enforcement of a subpoena served by the Drug Enforcement

Administration (DEA) on an electricity company seeking information about the electricity

consumption at three specified customer addresses.  689 F.3d at 1111.  A DEA agent provided

the district court with an affidavit "stating that the subpoenaed records were relevant to

determine whether individuals at three residences were involved in the manufacture and

distribution of controlled substances," which would violate the Controlled Substances Act.  *Id.* at

1111, 1114.  And in *Tan*, the Ninth Circuit affirmed enforcement of a summons issued by the

United States Customs and Border Protection division of the Department of Homeland Security,

which provided the district court with a "declaration [that] explain[ed], among other things, that

Tan and companies that he owns and operates import merchandise and may have violated 19

U.S.C. § 1592 pertaining to the payment of duties."  16 F.4th at 1353.  The DOJ's declaration, by

contrast, lacks any mention of the kind of investigation at issue.  *Cf. Doe*, 253 F.3d at 260

(affirming denial of a motion to quash an 18 U.S.C. § 3486 subpoena in a case involving

allegations that a podiatrist had a "kickback" arrangement with two medical testing laboratories).

Because the DOJ has shown only that it has an "idle hope" of discovering information

related to a federal healthcare offense, it has not established a prima facie case.  *Goldman*, 637

F.2d at 667 (citation omitted).   To hold otherwise would be to contravene the statute, which

authorizes subpoenas only in an investigation of a federal healthcare offense.  18 U.S.C.

§ 3486(a)(1)(A)(i)(I); *see also Alyeska Pipeline Serv. Co.*, 836 F.2d at 447 (when a statute is

---

was auditing the Wellington; [and] the mudd sheets might help her reconstruct the Wellington's income
by exposing repeat banquet customers and tracing their payments for banquets held in 1992 and 1993."
*2121 Arlington Heights Corp. v. I.R.S.*, 109 F.3d 1221, 1224 (7th Cir. 1997).
     Similarly, although the First Circuit has observed that "a conclusory affidavit" is enough for an
agency to establish its prima facie case, the examples to which it cites contain more specific conclusions
than that presented here.  *See Gertner*, 65 F.3d at 968 (citing *Sylvestre v. United States*, 978 F.2d 25, 26
(1st Cir. 1992)).

limited to specific investigations, it does not authorize a broad "fishing expedition") (citation omitted).

### c. Improper purpose

Even if the DOJ's threadbare evidence establishes its prima facie case, Seattle Children's has carried its burden to show that the subpoena was issued for an improper purpose. Considering the many variations of the applicable legal standard as discussed thus far, the Court again begins with a point of clarification before turning to the parties' contentions.

#### (1) The meaning of "improper purpose" and a subpoena recipient's burden to challenge enforcement of a subpoena

To reiterate, when an agency satisfies its requirements to establish a prima facie case that its subpoena is valid, the burden shifts to the recipient of the subpoena to show (i) that these requirements are not met; or (ii) that enforcement of the subpoena would be an abuse of the court's process. *United States v. Jose*, 131 F.3d 1325, 1328 (9th Cir. 1997) (en banc) (citations omitted). Although these options have been articulated separately, *see, e.g.*, *id.*, the Supreme Court considers them as both part of a broader "good-faith exercise":

> Prior to a recommendation for prosecution to the Department of Justice, the IRS must use its summons authority in good faith. In *Powell*, the Court announced several elements of a good-faith exercise:
>
>> "[The Service] must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed . . . . [A] court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation."

*United States v. LaSalle Nat. Bank*, 437 U.S. 298, 313–14 (1978) (citations omitted).

Whether a subpoena is issued for an "improper purpose" is susceptible to at least two meanings.  It could mean that the subpoena is not issued to further an investigation within the authority conferred by Congress – the first of the factors in the Ninth Circuit's three-factor test. *See, e.g.*, *Fresenius Med. Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008) ("The lawful purpose of the subpoenas [issued under 18 U.S.C. § 3486] was to investigate FMC's Epogen practices, due to allegations of wrongdoing.").  Or it could mean that the subpoena is issued not only to further an investigation within the agency's authority but also for a different, suspect purpose such as settling a collateral dispute.  Granted, there may be no daylight between these meanings if issuing a subpoena for such a suspect purpose would not be authorized by Congress.[6]  But the Court need not resolve this issue because Seattle Children's shows that the DOJ did not issue its subpoena to investigate a federal healthcare offense.

Before turning to the evidence presented by Seattle Children's, the Court observes that the weight of its burden is unclear.  The Ninth Circuit has explained that "[o]nce the government establishes a *prima facie* case, the person opposing the summons shoulders a 'heavy burden' to 'disprove' the government's showing." *Tan*, 16 F.4th at 1352–53 (quoting *Crystal*, 172 F.3d at 1144).  But this characterization originates from the Supreme Court's decision in *LaSalle Nat. Bank*, 437 U.S. at 316.  There, the Supreme Court considered whether a finding that an IRS agent issues summonses solely to discover evidence of criminal conduct "necessarily leads to the

---

[6] As the Fourth Circuit has summarized in another case involving an 18 U.S.C. § 3486 subpoena:

> Articulating the reasonableness standard, the Supreme Court has stated that subpoenas shall not be excessive for the purposes of the relevant inquiry; they must be authorized by Congress for a purpose Congress can order; and they must be relevant to the inquiry. The requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from engaging in arbitrary fishing expeditions and from selecting targets of investigation out of malice or an intent to harass.

*In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (cleaned up).

conclusion that the summonses were not issued in good-faith pursuit of the congressionally authorized purposes of § 7602." *Id.* at 307–08. The Court concluded that it could not enforce an IRS summons issued solely to uncover criminal conduct because such a summons would not satisfy the "*Powell* standards of good faith," discussed above. *Id.* at 314–18. But the Court pointed out that "[f]or a fraud investigation to be solely criminal in nature would require an extraordinary departure from the normally inseparable goals of examining whether the basis exists for criminal charges and for the assessment of civil penalties." *Id.* at 314. Thus, the Court concluded that the burden of "disprov[ing] the actual existence of a valid *civil* tax determination or collection purpose" by the IRS is a "heavy one." *Id.* at 316 (emphasis added).

Although the Ninth Circuit has cited this "heavy" burden in a case involving a summons issued by an agency other than the IRS, *Tan*, 16 F.4th at 1352–53, this appears at odds with the Ninth Circuit's disapproval of conflating the powers of one agency with that of another. *See Peters*, 853 F.2d at 699. And while *Children's Hosp.*, 719 F.2d at 1428, observes that a court can set aside a subpoena if the recipient "proves the inquiry is unreasonable because it is overbroad or unduly burdensome," it does not specify the burden. For lack of guidance, the Court adopts the preponderance standard that other circuits appear to have recognized. *See Gertner*, 65 F.3d at 967 (citing *United States v. Kis*, 658 F.2d 526, 540 (7th Cir. 1981), *abrogated on other grounds by Church of Scientology of California v. United States*, 506 U.S. 9, 15 n.8 (1992)). This preponderance standard is a "heavy" burden when a taxpayer contends that "the IRS seeks the information in the summoned documents for use solely in a criminal prosecution." *Kis*, 658 F.2d at 540–41. It is not as heavy of a burden here, where Seattle Children's contends that the DOJ did not issue its subpoena for the purpose of investigating a federal healthcare offense. Granted, the DOJ has broad authority to issue a subpoena relevant to the investigation of a federal healthcare offense. *See Doe*, 253 F.3d at 265 (quoting 18 U.S.C.

§ 3486(a)(1)(A)). But it is easier to show that the DOJ is not investigating a federal healthcare offense at all than it is to "disprove the actual existence of a valid civil tax determination or collection purpose by the [IRS]." *See Kis*, 658 F.2d at 540–41 (discussing and quoting *LaSalle Nat. Bank*, 437 U.S. at 316).

(2) The DOJ's improper purpose

Seattle Children's contends that because the subpoena was not prompted by any specific information or allegations of unlawful activity, Dkt. # 2 at 3, ¶ 4e, the DOJ's contention that it was issued to investigate a federal healthcare offense is likely pretextual. And it asserts that the DOJ issued the subpoena to further its broader goal of ending "gender-affirming treatment" in Washington state. Dkt. # 1 at 11–13 (quoting RCW § 7.115.010(3)). The Court agrees.

Because the DOJ's prima facie case that the subpoena is issued to investigate a federal healthcare offense is threadbare, it is more likely that this justification is pretextual. *See Gertner*, 65 F.3d at 968. The justifications presented in the DOJ's brief, which the Court considers for purposes of this inquiry, do little to mend its threadbare case. The DOJ says:

> The Government is conducting an investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the [FDCA]. Because public or private insurance plans were presented with claims related to off-label use of these medications, such a violation of the FDCA would constitute a "federal health care offense" as defined by 18 U.S.C. § 24.

Dkt. # 18 at 1–2. But the DOJ does not identify what entities presented insurance plans with such claims. It points out that Seattle Children's "provides gender-related care to minors, including the use of puberty blockers and cross-sex hormones" but does not connect this to a federal healthcare offense. *Id.* at 2. It cites Justice Thomas's concurrence in *United States v. Skrmetti*, 145 S. Ct. 1816, 1841 (2025) (Thomas, J., concurring), which observes that it is not unlawful for puberty blockers to be administered off-label.

To justify its investigation of Seattle Children's, the DOJ further relies on the concurrence. The DOJ explains:

> Noting "the lack of consensus over the efficacy and ethics of pediatric sex-transition treatments," Justice Thomas detailed how gender-related care for minors in the United States has been littered with potential consumer-protection violations: false statements made to induce patient and parental consent to off-label drug use and other life-altering procedures; powerful pharmaceuticals casually being given off-label to very young minors, causing lifelong side effects; purported treatment guidelines based on false or insufficient evidence; and other alarming trends that the Executive Branch could reasonably believe deserve exploration.

Dkt. # 18 at 7–8 (citing *Skrmetti*, 145 S. Ct. at 1845–49 (Thomas, J., concurring)). But Justice Thomas is not a DOJ employee. Thus, his views cannot reflect whether the DOJ is investigating a federal healthcare offense. And even if the DOJ adopts these views, they are not specifically related to conduct involving Seattle Children's.[7]

The DOJ's explanation for why Seattle Children's (abbreviated as "SCH") is the target of its subpoena is rife with speculation:

> Here, the Government has not made a decision as to whether SCH is a target—so whether SCH itself complied with all relevant laws is not relevant. SCH may be simply a witness to, for example, pharmaceutical companies promoting puberty blockers for off-label use. Or it may be a witness to whom other people or entities directed false statements on the topic of gender-related pharmaceuticals for minors. Or SCH personnel may have committed federal health care offenses without the knowledge of SCH management.

Dkt. # 18 at 9. To be sure, a subpoena can be warranted based on some speculation. But even if the representations in the DOJ's brief could establish its prima facie case, they do not go much beyond "the minimal showing of specificity required." *Goldman*, 637 F.2d at 667. They do not

---

[7] The DOJ also asserts that the *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, published by the World Professional Association for Transgender Health, is based on insufficient evidence. Dkt. # 18 at 7–8 & n.5. Even if this were true, it is unclear why it is pertinent to the DOJ's investigation of a federal healthcare offense as it relates to Seattle Children's.

show that the DOJ has much more than an "idle hope" of discovering information relevant to the investigation of a federal healthcare offense. *Id.* (citation omitted).

By contrast, Seattle Children's presents significant evidence that the DOJ issued the subpoena to pressure hospitals into ending gender-related care for minors. As discussed *supra* Section II, Shumate issued the subpoena the same day he issued a memorandum stating that the Civil Division will prioritize investigations of hospitals for possible FDCA violations "consistent with" the EO and the Bondi Memo. Dkt. # 2-1 at 51–52. Both the EO and the Bondi Memo strongly suggest that the purpose of investigating possible violations of the FDCA are to end gender-related treatment for minors. The EO orders the Attorney General to prioritize investigations of FDCA violations "by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* at 31. And the Bondi Memo directs investigations of FDCA violations to "hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations." *Id.* at 46. Both the EO and the Bondi Memo state that the main goal is to end practices related to gender-related care for minors. *See id.* at 30, 48. To support this point, Seattle Children's provides a February 3, 2025, White House press release stating:

> [The EO is] already having its intended effect—preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex. Hospitals around the country are taking action to downsize or eliminate their so-called "gender-affirming care" programs.

Dkt. # 1 at 7 (citing Dkt. # 2-1 at 55). The press release identifies hospitals in New York, Colorado, Virginia, Washington, D.C., Illinois, and Pennsylvania, that have stopped, suspended, or are reviewing gender-related care for minors. Dkt. # 2-1 at 55–56.

Considering the DOJ's threadbare support for its subpoena, this evidence shows that the DOJ requested documents as part of an effort to end gender-related care for minors. Because the

DOJ does not contend that providing gender-related care for minors is a federal healthcare offense, its subpoena was not lawfully issued under 18 U.S.C. § 3486(a)(1)(A)(i)(I). *See Gertner*, 65 F.3d at 970 (affirming a district court's finding of improper purpose where the agency's case for enforcing a subpoena depended solely on a conclusory declaration).

Contrary to the DOJ's contentions, this conclusion is based on narrow and principled legal grounds. The DOJ contends that a "free-wheeling inquiry" into an agency's purpose, especially in the context of a "politically charged topic" like gender-related care for minors, amounts to merely a value judgment as to whether a purpose is "improper." Dkt. # 18 at 4, 7. But the Court's opinion on the propriety of gender-related care for minors is not at issue. The Court considers only whether the DOJ served its subpoena for a purpose within its statutorily conferred authority. Because Seattle Children's has carried its burden of showing that the DOJ did not issue its subpoena to investigate a federal healthcare offense, the subpoena must be set aside. *See In re Sealed Case (Admin. Subpoena)*, 42 F.3d at 1418 ("[I]n the absence of specific authority in its enabling statute, [an agency] cannot rely on its broad investigatory powers to pursue 'other wrongdoing, as yet unknown.'"). The Court need not delve into whether the subpoena must still be set aside even if the DOJ had issued its subpoena to investigate a federal healthcare offense.

For the avoidance of doubt, the Court distinguishes the cases that the DOJ relies on. First, the DOJ suggests that a subpoena recipient must show that the improper purpose is to violate a law other than the statute authorizing the agency to issue the subpoena. Dkt. # 18 at 5–6. It cites *United States Immigr. & Customs Enf't v. Gomez*, 445 F. Supp. 3d 1213, 1216 (D. Colo. 2020), which states that an "unstated, nefarious, legally inappropriate reason" can be an improper purpose. But the court states only that such reasons are examples of an improper purpose; the list is not exclusive. *Id.* Even if a purpose to engage in unlawful conduct is

sufficient to set aside a subpoena, it is unneeded.  The subpoena can, as here, be unlawful because it exceeds the scope of the agency's authority.

Second, the DOJ cites *Sec. & Exch. Comm'n v. McGoff*, 647 F.2d 185, 187 (D.C. Cir. 1981), in which the D.C. Circuit affirmed enforcement of a subpoena issued by the Securities and Exchange Commission (SEC) requesting documents related to a controversial newspaper publisher.  The DOJ relies on the case to suggest that courts cannot consider the purpose for which a subpoena is issued. Dkt. # 18 at 7.  But the DOJ cites part of the opinion affirming the district court's denial of the newspaper publisher's request for discovery to determine whether the SEC was politically motivated.  *McGoff*, 647 F.2d at 193–94.  Whether a recipient of a subpoena is entitled to discovery involves an inquiry separate from whether the subpoena should be enforced.  *See id.* at 193 (affirming the district court's application of "the general rule excluding discovery in summary subpoena enforcement proceedings absent 'extraordinary circumstances'") (citation omitted).

\* \* \*

In sum, the DOJ has not established a prima facie case that its subpoena was issued with a realistic expectation that it would uncover information relevant to a federal healthcare offense. And even if the DOJ's sparse evidence establishes its prima facie case, Seattle Children's has shown that the subpoena cannot be enforced because it was not issued to investigate a federal healthcare offense.[8]  To underscore this conclusion, the Court emphasizes that although courts have grappled with the applicable standard of review, the core inquiry is one of balancing a public interest in allowing for agency investigations as authorized by Congress against private

---

[8] Because the Court concludes that the DOJ has not shown that it is investigating a federal healthcare offense, the Court cannot determine whether the information sought under the subpoena is relevant or material to the investigation.  Thus, the Court neither reaches these issues nor Seattle Children's contention that the requested documents raise privacy concerns. Dkt. # 1 at 13–16.

interests that, although not granted full Fourth Amendment protection, are nonetheless safeguarded. As the Supreme Court has summarized, these private interests are

> the interests of men to be free from officious intermeddling, whether because irrelevant to any lawful purpose or because unauthorized by law, concerning matters which on proper occasion and within lawfully conferred authority of broad limits are subject to public examination in the public interest. Officious examination can be expensive, so much so that it eats up men's substance. It can be time consuming, clogging the processes of business. It can become persecution when carried beyond reason.

*Oklahoma Press Pub. Co.*, 327 U.S. at 213. Based on the scope of the DOJ's authority under 18 U.S.C. § 3486(a)(1)(A)(i)(I), the DOJ's threadbare justification for its subpoena, and strong evidence suggesting that the subpoena was issued for an improper purpose, the Court concludes that private interests must prevail in this case.[9]

B.     Motion to Seal Docket

Seattle Children's moves to seal the docket because disclosure of the DOJ's investigation will harm its reputation and put at risk the privacy and safety of its patients and employees. Dkt. # 4 at 4–6. Seattle Children's asserts that there are no less restrictive alternatives to sealing the entire docket because Seattle Children's is the only children's hospital in Seattle. Dkt. # 3 at 3, ¶ 9. The DOJ does not respond to this assertion; it merely says that it "stands ready and willing to meet and confer with the hospital about sealing, redacting, or protecting any protected health information or other information identified in Local Civil Rule 5.2 in any future filings."[10] Dkt. # 17 at 7. Thus, the Court does not consider any less restrictive alternatives.

---

[9] The DOJ does not request an evidentiary hearing. *See Gertner*, 65 F.3d at 969–70 (no abuse of discretion in quashing a subpoena without an evidentiary hearing where the agency did not request one).

[10] LCR 5.2(a) provides that parties must refrain from including or partially redact personal data identifiers such as dates of birth, names of minor children, social security numbers and taxpayer-identification numbers, financial accounting information, and passport and driver license numbers.

1.     Records traditionally kept secret

Although there is a general right to access judicial records, "[a] narrow range of documents is not subject to the right of public access at all because the records have 'traditionally been kept secret for important policy reasons.'" *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Times Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir. 1989)).  Because determining whether records fall under this category requires evaluation of the First Amendment right of access, the Ninth Circuit applies the "experience and logic" test, which asks: (1) whether the type of proceeding at issue has been traditionally conducted in secret (experience); and (2) whether public access supports the function of the particular proceeding (logic).  *Forbes Media LLC v. United States*, 61 F.4th 1072, 1077–78 (9th Cir. 2023).

Based on the limited briefing before it, the Court concludes that administrative subpoenas do not fall under this narrow category.  The statute authorizing the subpoena here provides:

> A United States district court for the district in which the summons is or will be served, upon application of the United States, may issue an ex parte order that no person or entity disclose to any other person or entity (other than to an attorney in order to obtain legal advice) the existence of such summons for a period of up to 90 days.

18 U.S.C. § 3486(a)(6)(A).  Similarly, the recipient of the subpoena may move for "a prohibition of disclosure ordered by a court under paragraph (6)."  *Id.* § 3486(a)(5).  Because the parties must move to keep subpoena proceedings under seal, there appears to be a presumption that such subpoenas are publicly disclosed.  That the statute maintains nondisclosure for a period of only 90 days subject to renewal also suggests that such subpoenas are not traditionally kept secret.  *Id.* § 3486(a)(6)(C).

## 2.    Compelling reason to seal records

But Seattle Children's has shown that there is a compelling reason to keep the docket under seal.  When documents do not fall under the category of records traditionally kept secret, the starting point is a strong presumption in favor of disclosure.  *Kamakana*, 447 F.3d at 1178. To overcome this strong presumption, a party must present "compelling reasons supported by specific factual findings" that "outweigh the general history of access and the public policies favoring disclosure."  *Id.* at 1178–79 (citations omitted).  If a "court decides to seal certain judicial records, it must 'base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture.'"  *Id.* at 1179 (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)).

It appears that in enacting 18 U.S.C. § 3486(a)(6), Congress determined that the interest in public disclosure presumptively outweighs privacy interests for subpoenas issued to investigate a federal healthcare offense.  Based on the limited briefing on this issue, it is unclear why Congress weighed the interests in this manner.  As the Ninth Circuit has observed in the context of grand jury and warrant materials, criminal investigations are generally conducted in secret because otherwise prospective witnesses might hesitate to come forward out of fear of retribution and there is a risk that "those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment."  *Times Mirror Co.*, 873 F.2d at 1215 (quoting *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979)). Moreover, "there would be the obvious risk that the subject of the search warrant would learn of its existence and destroy evidence of criminal activity before the warrant could be executed" and those identified as being suspects in the investigation might "coordinate their stories before testifying, or even flee the jurisdiction."  *Id.*

This analysis is similarly applicable to the subpoena at issue here. Again, the DOJ says that Seattle Children's might have witnessed pharmaceutical companies promoting puberty blockers for off-label use, or that its employees might have committed federal healthcare violations without its management's knowledge. Dkt. # 18 at 9. As the statute recognizes, unsealing the docket might cause pharmaceutical companies or employees of Seattle Children's to, for example, destroy evidence. *See* 18 U.S.C. § 3486(a)(6)(B) (allowing a court to issue an order prohibiting disclosure of a subpoena where disclosure might cause, among other things, "destruction of or tampering with evidence"). But whereas the Ninth Circuit has held that the interests in preserving a criminal investigation outweigh First Amendment interests, *Times Mirror Co.*, 873 F.2d at 1215, Congress has, at least in setting the initial presumption, made a contrary determination in the context of a subpoena issued to investigate a federal healthcare offense.

Congress's balancing of the interests in favor of public disclosure, however, is only entitled to deference if the subpoena is lawfully issued under the statute. The compelling reason for sealing the docket is that the DOJ did not issue its subpoena to investigate a federal healthcare offense. As discussed *supra* Section III.A.3, the DOJ issued its subpoena solely to end gender-related care for minors. And just as a subpoena cannot be enforced if it is issued for an improper purpose, court files cannot be disclosed if they "have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447 F.3d at 1179 (quotation marks and citation omitted). To reiterate, the Court takes no position on whether ending gender-related care for minors is an improper purpose in itself. But such a purpose is improper to the extent that it

involves using the public nature of the court system not to further a lawful investigation but to amplify a bare accusation of criminal conduct.[11]

In addition to the evidence discussed *supra* Section III.A.3.c.(2), Seattle Children's provides a DOJ press release issued on July 9, 2025, announcing that the DOJ has "sent more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children." Dkt. # 21-1 at 2. Although it states that the DOJ's "investigations include healthcare fraud, false statements, and more," it ends with the Attorney General's statement that "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice." *Id.* That the DOJ publicized its subpoenas undermines the veracity of its stated purpose of investigating federal healthcare violations and supports its other stated purpose of holding medical professionals and organizations "accountable" for providing gender-related care for minors. *Id.* As discussed above, publicizing the subpoenas frustrates the purpose of investigating a federal healthcare violation.

Issuing a press release, however, supports the purpose of ending gender-related care for minors because even if targeted individuals or entities are not engaged in unlawful activity, they might still be deterred from participating in such care. For example, Children's National Hospital has announced that it "will be discontinuing the prescription of gender-affirming medications" because "of escalating legal and regulatory risks to Children's National, our

---

[11] Although the DOJ's Civil Division issued the subpoena and the DOJ has informed counsel for Seattle Children's that it has not determined whether its investigation is civil or criminal in nature, Dkt. # 2 at 2, ¶ 4c, 18 U.S.C. § 3486(a)(1)(A)(i)(I) specifically authorizes issuance of subpoenas to investigate criminal federal healthcare offenses because it cites 18 U.S.C. § 24.

providers, and the families we serve."[12] Dkt. # 21-4 at 2. Dr. Jeffrey Ojemann, Chief Physician

Executive at Seattle Children's, also declares that there could be safety risks to providers of

gender-related care for minors. He says that he is aware of "at least one medical provider who

provides gender-affirming care at Seattle Children's [who] has received a suspicious package

with concerning notes inside." Dkt. # 3 at 9, ¶ 45. He also says that Seattle Children's has

"hired a full-time security guard and installed panic buttons at the Gender Clinic, and has

conducted drills for bomb threats and active shooters, and developed processes for managing

phone threats related to gender-affirming care." *Id.*

Public disclosure would also deter prospective and current minor patients from seeking

gender-related care. Dr. Ojemann declares that public disclosure of a criminal investigation

involving patient records may lead patients and families to be "reluctant to pursue care or to fully

disclose information needed for the Hospital to provide effective care." *Id.* at 9, ¶ 43–44. This is

supported by the declarations of anonymous parents of transgender children, who say, for

example, that they are "fear[ful] of being identified and targeted by the Federal Government."

Dkt. # 4 at 7 (quoting Dkt. # 2-1 at 180, ¶ 2). To be sure, that Seattle Children's provides

gender-related care for minors and the Administration's position on such care are well-known

facts. But disclosing that Seattle Children's is being specifically targeted would exacerbate the

fears of its employees and patients.

---

[12] Seattle Children's also provides evidence of the University of Chicago Medical Center's announcement that "it will discontinue all gender-affirming pediatric care . . . in light of emerging federal actions which would place at risk our ability to care for all Medicare or Medicaid patients." Dkt. # 21-3 at 2. Because such evidence does not specifically show how a healthcare provider has changed its behavior in response to the issuance of a subpoena, it is of limited weight. But it nonetheless supports the general premise that the EO is intended to end gender-related care for minors. The EO orders the Secretary of Health and Human Services to "take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve" among other things, "Medicare or Medicaid conditions of participation or conditions for coverage." Dkt. # 2-1 at 31.

Thus, unsealing the docket will harm Seattle Children's reputation and its provision of gender-related care for minors. As "the Supreme Court has acknowledged[,] one of the reasons for maintaining the secrecy of grand jury proceedings is to 'assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.'" *Times Mirror Co.*, 873 F.2d at 1216 (quoting *Douglas Oil Co. of California*, 441 U.S. at 219). Such a concern is of greater weight where the accusation is based not on a good faith investigation but to chill certain conduct.[13] The DOJ counters that avoiding "embarrassment, incrimination, or exposure to further litigation," are not, "without more," compelling reasons to seal documents. *Kamakana*, 447 F.3d at 1179 (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136 (9th Cir. 2003)). Granted, it is possible to view reputational harm as a form of embarrassment and a chilling effect as a natural byproduct of any litigation. But prohibiting an agency from using its subpoena power for an improper purpose is a compelling reason to seal documents, especially where disclosing the documents would further that improper purpose.

The DOJ suggests an alternative analysis that, while well-taken, is unpersuasive. It cites authority emphasizing that "[t]he appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987). But that authority recognizes that "the public's right to inspect such records . . . can be

_____

[13] The DOJ quotes *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 141 (D.D.C. 2012) for the proposition that "revealing the fact that [the subpoena recipient] is the subject of some kind of government investigation" is "unavailing" as a reason to seal the docket. Dkt. # 17 at 6. But the cited passage from that case goes on to explain, "Although the respondent repeatedly emphasizes the pending confidential investigation, that involves serious allegations of misconduct which would expose Respondent to reputational damage and harm, the Government's investigation of Inchscape has been public knowledge for some time." *ISS Marine Servs., Inc.*, 905 F. Supp. 2d at 141 (quotation marks and internal citations omitted) (emphasis added). By contrast, the present proceedings have not been public knowledge.

blunted if 'court files might . . . become a vehicle for improper purposes.'" *Id.* (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)). That the public has a right to evaluate the executive branch and the judiciary does not mean that the executive branch has unfettered authority to amplify bare accusations of criminal conduct through the public court system. And any abuse by the judiciary is offset to some extent by the ordinary process of appellate review.

## IV
### CONCLUSION

For these reasons, the Court GRANTS Seattle Children's motion to set aside the subpoena and motion to seal the docket. The Court ORDERS as follows:

- Subpoena Duces Tecum No. 25-1431-016 is HEREBY SET ASIDE;
- The docket in this action and all submittals filed thereon shall be maintained under seal;
- Seattle Children's may nonetheless communicate with, and provide sealed filings to, the Washington Attorney General's Office;
- The Washington Attorney General's Office may attend any sealed hearings in this proceeding; and
- The Washington Attorney General's Office shall comply with this Order.

Dated this 3rd day of September, 2025.


John H. Chun
United States District Judge