# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Misc. No. 25-mc-00063-SKC-CYC

In re: Department of Justice Administrative Subpoena No. 25-1431-030

---

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Cyrus Y. Chung, United States Magistrate Judge.**

 Congress grants certain administrative agencies authority to issue subpoenas in aid of investigations premised on specific, enumerated statutes. When the recipient of one of these subpoenas moves to quash it, the government must demonstrate that its requests are reasonably relevant to the subpoena's congressionally-authorized purpose. The government does not do so here. And nothing in that grant of authority contemplates using such subpoenas to try to end practices that the statutes do not prohibit. Here, the government served upon petitioner Children's Hospital Colorado a subpoena animated by that improper purpose. For the reasons that follow, then, the Court recommends that the petitioner's Motion to Quash Subpoena, ECF No. 1, be **GRANTED**.

### BACKGROUND

 On July 14, 2025, the United States Department of Justice served the petitioner with Administrative Subpoena No. 25-1431-030 (the "Subpoena"). ECF No. 1-3 ¶ 3. On its face, the Subpoena purports to be "necessary . . . to investigate Federal health care offenses" and invokes 18 U.S.C. § 3486 for its authority. ECF No. 1-4 at 2. It seeks to compel the disclosure of information about the petitioner's provision of "gender-related care," which the Subpoena defines as treatment provided to allow individuals to resemble, physically or socially, another biological sex. ECF No. 1-4 at 6, 8–10. The Subpoena contains fifteen requests for documents:

- Complete personnel files for the petitioner's employees, contractors, or affiliates (Request 1);

- Records regarding the use of diagnosis codes for both gender-related care and for more general care of minors (Requests 2 and 3);

- Documents and communications relating to billing and coding practices for and the medical consequences of gender-related care (Requests 4–6, 14–15);

- Communications with and documents from pharmaceutical manufacturers regarding the use of puberty blockers, hormones, or other products for gender-related care (Requests 7–9);

- Documents relating to promotional arrangements or contracts between the petitioner and manufacturers of puberty blockers or hormones (Request 10); and

- Patient data, including name, address, and social security information for minors who received puberty blockers or hormone therapy; medical records "relating to the clinical indications, diagnoses, or assessments" leading to the prescription of such medicines; and intake, informed consent, and parent authorization documentation for such patients (Requests 11–13).

ECF No. 1-4 at 8–10. Following receipt of the Subpoena, the petitioner met and conferred with the government. ECF No. 1-3 ¶ 5. For some requests, that resulted in a narrower focus: the government clarified, for example, that its interest in Requests 1 through 3 extended only so far as they related to the petitioner's TRUE Center for Gender Diversity, *see* ECF No. 1-5, which provides "a safe and supportive environment for transgender youth to be their authentic selves" at which some, but "[n]ot all . . . patients . . . receive medical gender-affirming care." ECF No. 1-15 ¶ 16. For other requests, the effort was futile: the government insisted, for instance, that it had a right to the patient information referenced in Requests 11 through 13 and rebuffed any compromise that required de-identifying patient records. ECF No. 1-3 ¶ 9.

Having clarified the scope of the Subpoena, the petitioner later met again with the government, urging it to withdraw the Subpoena. *Id.* ¶ 15. The government refused. *Id.*

The next day, the petitioner filed this action, seeking to quash the Subpoena. ECF No. 1. The district judge referred the motion to quash to the undersigned. ECF No. 11. After standard

briefing, the government sought to file a surreply, ECF No. 18, which the Court denied. ECF No.

32. A group of states, including Colorado, sought to file a brief as *amici*. ECF No. 25. The Court

granted that unopposed request. ECF No. 33.

## ANALYSIS

"Administrative agencies wield broad power to gather information through the issuance

of subpoenas." *Resol. Tr. Corp. v. Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994). These

agencies are part of the government's Executive Branch and include the Department of Justice.

*See United States v. Markwood*, 48 F.3d 969, 975 (6th Cir. 1995) (citing 5 U.S.C. §§ 101, 105,

500, 551). But that power is not unlimited. Because "[a]n administrative agency's authority to

issue subpoenas 'is created solely by statute,'" the terms of the relevant statute impose specific

limitations on the corresponding subpoena authority. *Consumer Fin. Prot. Bureau v. Accrediting

Council for Indep. Colls. & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (quoting *Peters v. United

States*, 853 F.2d 692, 696 (9th Cir. 1988)). The Fourth Amendment's guarantee that "[t]he right

of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated," U.S. Const. amend. IV, also cabins administrative-

subpoena use more generally. *See v. City of Seattle*, 387 U.S. 541, 544 (1967).

These twin limitations engender corresponding obligations for district courts faced with

whether to enforce an administrative subpoena. "A district court's first task" in this inquiry "is to

decide whether the agency has met the statutory requirements pertaining to the issuance and

enforcement of the subpoena." *Markwood*, 48 F.3d at 976–77. "Next, the court must consider

whether the agency has satisfied or complied with the judicially-created standards for

enforcement of the subpoena." *Id.* at 977. In this Circuit, for non-tax subpoenas, these inquires

are subsumed into "the 'reasonable relevance' standard," under which "administrative subpoenas

will generally be enforced if 'the inquiry is within the [statutory] authority of the agency,'"

*United States v. Wilson*, 98 F.4th 1204, 1221 (10th Cir. 2024) (quoting *United States v. Morton*

*Salt Co.*, 338 U.S. 632, 652 (1950)), "and if the subpoena is 'sufficiently limited in scope,

relevant in purpose, and specific in directive so that compliance will not be unreasonably

burdensome.'" *Id.* (quoting *Becker v. Kroll*, 494 F.3d 904, 916 (10th Cir. 2007)). The

government bears the initial burden of "mak[ing] a prima facie showing" of reasonable

relevance. *Id.*

      If the government carries its burden, the subpoena's recipient can still attempt to

"demonstrat[e] that the government has not met this standard," *id.*, or "that judicial enforcement

'would amount to an abuse of the court's process,'" *United States v. Whispering Oaks*

*Residential Care Facility*, 673 F.3d 813, 817 (8th Cir. 2012) (quoting *EEOC v. Peat, Marwick,*

*Mitchell & Co.*, 775 F.2d 928, 931 (8th Cir. 1985)). The recipient "bears a heavy burden" in

these endeavors, *id.* at 817; *accord Standing Akimbo, LLC v. U.S. through IRS*, 955 F.3d 1146,

1155 (10th Cir. 2020), compared with the government's "slight" initial burden. *ICE v. Gomez*,

445 F. Supp. 3d 1213, 1216 (D. Colo. 2020).

      In analyzing the Subpoena, the Court does not write on a pristine page. Several courts

have ruled on similar subpoenas sent to providers of gender-related care around the country.

"[N]o reported federal decision has ruled in the government's favor." *In re: 2025 UPMC*

*Subpoena*, No. 2:25-mc-01069-CB, 2025 WL 3724705, at *1 (W.D. Pa. Dec. 24, 2025).

      The Court joins the chorus. Notwithstanding the government's relatively light burden, the

government's meager attempt to carry it falls short. In all events, the petitioner's evidence of

abuse of the court's process abounds.

## I.    Prima Facie Case

### A. Statutory Authority

The statute authorizing the Subpoena permits "the Attorney General" to "issue in writing and cause to be served a subpoena requiring . . . the production of any records or other things relevant to the investigation" in "any investigation of . . . a Federal health care offense." 18 U.S.C. § 3486(a)(1)(A)(i)(I), (a)(1)(A)(iii), (a)(1)(B)(i). The "Attorney General" includes her "designee," *Whispering Oaks*, 673 F.3d at 817; *see* 28 U.S.C. § 510 (permitting the Attorney General to authorize an "officer, employee, or agency of the Department of Justice" to perform her functions), and "a Federal health care offense" includes violations of "section 301 of the Federal Food, Drug, and Cosmetic Act [the "FDCA"] (21 U.S.C. [§] 331)." 18 U.S.C. § 24(a).

The government indicates, by way of declaration, that the Attorney General has authorized the Assistant Attorney General for the Civil Division (the "AAG-Civil") to wield her section 3486 authority "to investigate violations of the FDCA that relate to a health care benefit program" and that the government is investigating potential FDCA violations by "off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors." ECF No. 10-1 ¶¶ 5–6. The AAG-Civil, it says, issued the Subpoena in connection with that investigation. *Id.* ¶ 7; *see* ECF No. 1-4 at 2. No more is necessary to show compliance with the statutory requirements for authorization of the Subpoena. *See In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041-JHC, 2025 WL 3562151, at *5 (W.D. Wash. Sept. 3, 2025) ("*Seattle Children's*").

The petitioner protests. The government's own Justice Manual, it notes, lists only United States Attorneys and the Assistant Attorney General for the Criminal Division as the Attorney General's designees for section 3486 authority, not the AAG-Civil. ECF No. 17; *see* U.S. Dep't of Justice, Justice Manual § 9-44.201. That is true. But the petitioner "does not show that this

provision of the Justice Manual is an exclusive list of individuals to whom the Attorney General has delegated such authority" and therefore provides no reason to disbelieve the government's declaration on this point, especially when the government's burden here is only "slight." *Seattle Children's*, 2025 WL 3562151, at *5.

The government meets its burden as to statutory authority.

### B. Limited In Scope

Regarding the Subpoena's substantive justifications, though, the government's perfunctory efforts fall short. It pays lip service, for example, to the requirement that its requests be limited in scope. ECF No. 10 at 2. But neither its supporting declaration nor its response to the petitioner's motion even attempt to explain the propriety of the Subpoena's scope. The declaration never deigns to explain the government's investigation, let alone how the Subpoena is right-sized for it. *See* ECF No. 10-1 at 3. And although the motion response mentions "scope" once when acknowledging the Tenth Circuit's requirements, the word makes no repeat appearance thereafter. *See* ECF No. 10. The prima facie burden is not a heavy one — even "a simple affidavit of an agent involved in the investigation" will do, *Wilson*, 98 F.4th at 1221 — but mere handwaving over the Fourth Amendment's requirements cannot carry even that slight burden. *Seattle Children's*, 2025 WL 3562151, at *8–9. After all, while the "review" of an administrative subpoena "is narrow, it is not without content." *Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d at 691.

Even ignoring the government's inattention to this requirement, an attempt at a self-guided tour through the Subpoena's scope fares no better. Rather than limiting its request for patient data to some criteria relevant to an ostensible investigation into misbranded labeling, for instance, *compare Wilson*, 98 F.4th at 1222 (justifying subpoena based on narrowing of request for patient data to "only documents and records that are relevant to conditions for which a

controlled substance was prescribed"), Requests 11 to 13 create a dragnet designed to sweep in

all patient data related to any prescription of puberty blockers or hormone therapy. ECF No. 1-4

at 9; *see In re Admin. Subpoena No. 25-1431-019*, --- F. Supp. 3d ----, 2025 WL 2607784, at \*6

(D. Mass. Sept. 9, 2025) ("*Boston Children's*") (noting "astonishingly broad" request for "all

medical records and personal information of patients"). Likewise, "Request Numbers 7–9 are

facially overbroad, as they seek [the petitioner's] communications with manufacturers, sales

representatives, marketing departments, and medical science liaisons regarding the treatment of

gender dysphoria and the use of puberty blockers or hormones generally, not just those used 'off-

label.'" *QueerDoc, PLLC v. U.S. Dep't of Justice*, --- F. Supp. 3d ----, 2025 WL 3013568, at \*6

(W.D. Wash. Oct. 27, 2025); *accord Boston Children's*, 2025 WL 2607784, at \*6.

In short, the Subpoena never attempts to satisfy its burden as to limited scope, and the

Subpoena evinces itself little effort to cabin itself appropriately.

## C.  Relevant in Purpose

The Subpoena fares little better when measured for relevance.

In theory, the government is investigating violations of the FDCA. That law "outlaws

drug misbranding." *United States v. Williams*, 549 F. App'x 813, 816 (10th Cir. 2013). In

particular, "[u]nder 21 U.S.C. § 331, it is unlawful to introduce, deliver, or receive in interstate

commerce misbranded drugs." *Id.* Accordingly, "[t]he FDCA creates both civil and criminal

penalties for drug manufacturers that promote the use of approved drugs for unapproved uses

(referred to here as "off-label" uses)." *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915

F.3d 1, 5 (1st Cir. 2019). "The FDCA, however, does not prohibit doctors from prescribing drugs

for off-label uses." *Id.*; *accord UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 127 (2d Cir.

2010) ("While off-label prescriptions are permitted within a physician's discretion, drug

manufacturers are prohibited from promoting off-label uses in marketing a drug."); *In re*

*Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir.

2012) ("[T]here is a certain 'asymmetry' in the regulation of off-label uses: while physicians

may lawfully prescribe drugs for off-label uses, the FDCA generally prohibits manufacturers

from marketing these uses to physicians.").

Given that misbranding in the stream of commerce is the FDCA's focus, Requests 11 to

13, which seek personal health data, "have little to do with investigating violations of FDCA."

*QueerDoc*, 2025 WL 3013568, at *6. "These requests concern how clinicians treated individual

children and intimate clinical details shedding no light on whether the Hospital introduced a

misbranded or unapproved drug into interstate commerce under the [FDCA] and Section 331." *In

re Subpoena No. 25-1431-014*, --- F. Supp. 3d ----, 2025 WL 3252648, at *14 (E.D. Pa. Nov. 21,

2025) ("*Children's Hosp. of Phila.*"). They are not, therefore, relevant in purpose to an FDCA

investigation.

Nor does the government seriously contend otherwise. Instead, invoking the maxim that

relevance is broadly construed for administrative subpoenas, it points to the petitioner's position

as a prominent provider of puberty blockers and hormone therapy and concludes that all records

related to that function must be relevant. ECF No. 10 at 10.

"To be sure, Congress . . . may permissibly grant broad investigative authority to

regulatory agencies." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003)

(citing *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 204–05 (1946)). And where Congress

gives the agency broad latitude, courts must construe relevance accordingly. *See, e.g.*, *United

States v. Balanced Fin. Mgmt.*, 769 F.2d 1440, 1443 (10th Cir. 1985). But while the petitioner is

"the leading provider of pediatric healthcare across the Rocky Mountain region." ECF No. 1-15

¶ 5, "[m]ore patients," even patients who seek gender-affirming care, "do[es] not" itself "mean

there could be more fraud." *Children's Hosp. of Phila.*, 2025 WL 3252648, at *16. The government also surmises that the minors' patient information could aid them in finding potential witnesses to FDCA violations. ECF No. 10 at 10. But its "reliance on children's identities, social security numbers, and addresses as 'investigative leads'" only "underscores the speculative nature of" the patient data requests. *Children's Hosp. of Phila.*, 2025 WL 3252648, at *14. In the end, "Congress in Section 3486 authorizes the Department of Justice to compel documents *relevant* to an investigation—not to conduct open-ended discovery in search of witnesses or narratives to support a theory." *Id.* Where the government "offers no basis for compelling disclosure of child-patient identities and intimate medical records," it fails to show compliance with that statutory mandate. *Id.* at *18. This is not, for instance, a subpoena directed to an investigative target itself suspected of submitting fraudulent medical reimbursement claims. *See In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000). The Subpoena's relevance is far more lacking.

At the very least, then, Requests 11 through 13 fail the relevance test. Given the government's failure to meet its burden on two of the prongs of the reasonable-relevance test, there is little reason to analyze whether the Subpoena is also unduly burdensome. The short of it is that the government never attempts to explain how the Subpoena is limited in scope, and its theory of relevance is too attenuated at least to Requests 11 to 13 to satisfy its prima facie burden, making it appropriate to quash the Subpoena.

## II.    Abuse of the Court's Process

The Subpoena is unenforceable for an additional reason: it abuses the Court's enforcement process. "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *United States v. Powell*, 379 U.S. 48, 58 (1964). "[A] court's process is abused where the subpoena is 'issued for an improper

purpose, such as to harass the [investigation's target] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'" *Doe v. United States*, 253 F.3d 256, 271–72 (6th Cir. 2001) (quoting *Powell*, 379 U.S. at 58); *see McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017) (teaching that a subpoena "issued for an 'illegitimate purpose'" should not be enforced (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984))). The assertion of court-process abuse "must not be based on the improper motives of an individual agency employee, but instead must be founded upon evidence that the agency itself, in an institutional sense, acted in bad faith when it served the subpoena." *Doe*, 253 F.3d at 272 (citing *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 314–16 (1978)). The petitioner builds a solid foundation of such evidence here.

To begin, upon taking office in January 2025, the President issued Executive Order 14168 ("EO 14168"), "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. 8615 (Jan. 20, 2025). It declared that "the policy of the United States" was "to recognize two sexes," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* at 8615. It directed "the Executive Branch" to "enforce all sex-protective laws to promote this reality" and labeled the idea "that males can identify as and thus become women and vice versa" a "false claim." *Id.*

Eight days later, the President issued Executive Order 14187 ("EO 14187"), "Protecting Children from Chemical and Surgical Mutilation." 90 Fed. Reg. 8771 (Jan. 28, 2025). It characterized "the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions" as a "dangerous trend" that "will be a stain on our Nation's history" that "must end." *Id.* at 8771. It restyled "gender-affirming care" — which the petitioner defines as "care designed to support and affirm an individual's gender identity" that "can include

social, psychological, behavioral, or medical interventions, or any combination of such care,"
ECF No. 1-15 ¶ 13 — as "chemical and surgical mutilation," focusing on the aspects of gender-
affirming care that employ "puberty blockers . . . sex hormones . . . and surgical procedures." 90
Fed. Reg. at 8771. EO 14187 further directed the head of each executive agency that provided
grants to medical institutions to "take appropriate steps to ensure" the end of gender-affirming
care. *Id.* at 8772. As for the Department of Justice, EO 14187 directed the Attorney General to
"prioritize investigations and take appropriate action to end deception of consumers, fraud, and
violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public
about long-term side effects of chemical and surgical mutilation." *Id.*

The Attorney General obliged. Less than three months later, "[p]ursuant to the
President's directive" in EO 14187, she "direct[ed] the Civil Division's Consumer Protection
Branch to undertake appropriate investigations of any violations of the Food, Drug, and
Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims
about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to
facilitate a child's so-called 'gender transition.'" Memorandum from Pamela Bondi, Attorney
General, to Select Component Heads, *Preventing the Mutilation of American Children* 3, 4 (Apr.
22, 2025), ECF No. 1-11 (the "Bondi Memo"). This was part of a strategy to "investigate and
hold accountable medical providers and pharmaceutical companies that mislead the public about
the long-term side effects of chemical and surgical mutilations." *Id.* at 4. That strategy also
included a directive to "the Civil Division's Fraud Section to pursue investigations under the
False Claims Act of false claims submitted to federal health care programs for any non-covered
services related to radical gender experimentation," such as "physicians prescribing puberty
blockers to a child for an illegitimate reason (*e.g.*, gender dysphoria) but reporting a legitimate

11

purpose (*i.e.*, early onset puberty) to the Centers for Medicare & Medicaid Services." *Id.* The

Attorney General pledged to use the Department of Justice to bring "the unconscionable

ideology behind 'gender-affirming care,'" — which she described as "a radical ideological

agenda" used "to justify the barbaric practice of surgically and chemically maiming and

sterilizing children" — "to an end." *Id.* at 1, 6.

In turn, the AAG-Civil issued a "Civil Division Enforcement Priorities" memorandum on

June 11, 2025. ECF No. 1-12 (the "Shumate Memo"). Citing EO 14168, EO 14187, and the

Bondi Memo, the Shumate Memo declared that "[t]he Civil Division will use all available

resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other

appropriate entities consistent with these directives." ECF No. 1-12 at 2. "These efforts will

include, but will not be limited to, possible violations of the Food, Drug, and Cosmetic Act and

other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-

called gender transition and (2) dealers such as online pharmacies suspected of illegally selling

such drugs." *Id.* at 2–3. "In addition," the Shumate Memo declared, "the Civil Division will

aggressively pursue claims under the False Claims Act against health care providers that bill the

federal government for impermissible services. This includes, for example, providers that

attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to

Medicaid with false diagnosis codes." *Id.* at 3.

Three weeks later, the AAG-Civil authorized the Subpoena. *See* ECF No. 1-4 at 2.

That "timeline tells the story." *QueerDoc*, 2025 WL 3013568, at *5. "Both the EO and

the Bondi Memo strongly suggest that the purpose of investigating possible violations of the

FDCA are to end gender-related treatment for minors." *Seattle Children's*, 2025 WL 3562151, at

*11. They "detail the Administration's goal of ending" gender-affirming care. *Boston Children's*,

2025 WL 2607784, at *6. "No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating" through the Subpoena. *QueerDoc*, 2025 WL 3013568, at *5. After all, the AAG-Civil authorized it mere weeks after the Shumate Memo, which he authored.

There is more. As discussed above, the scope of the Subpoena's Requests bear little relation to its supposed purpose of investigating FDCA violations. They appear determined instead to gather as much information about the TRUE Center, its personnel, and its patients with only "an 'idle hope' of discovering information related to a federal healthcare offense.'" *Seattle Children's*, 2025 WL 3562151, at *9. That overly broad scope further supports a finding that the government's proffered purpose for the Subpoena — investigating potential violations of the FDCA — is pretextual. *See, e.g.*, *United States v. Henry*, 491 F.2d 702, 705 (6th Cir. 1974) (holding that finding of pretextual purpose was "buttressed by . . . portion of the summons" from IRS that "could not apply to . . . civil liability").

The government's reaction to the petitioner's requests to narrow the Subpoena's scope only strengthens that conclusion. None of the government's accommodations corresponded with the FDCA offenses that its investigation supposedly targeted. Indeed, the government made explicit its focus not on the FDCA, but on "care provided to minors experiencing gender-related distress and the treatment and services provided to them." ECF No. 1-5 at 2. Its limits therefore had little to do with off-label drug distribution and everything to do with targeting the TRUE Center. *Id.* The government held fast, for instance, to Request 1's demand for "information related to" the "credentialing, hiring, compensation, and any derogatory information" about any employee at the TRUE Center "involved in the provision of care," regardless of whether the

13

employee was in any position to witness any off-label use. *Id.* Its revision of scope for Requests 2 and 3 drew similar boundaries. *Id.* at 2–3.

In short, "the Government cannot broadly make inquiry into the provision of [gender-affirming care] generally—any such inquiry must be limited to the healthcare fraud that is authorized by the statute: fraudulent billing codes and unlawful off-label promotion." *Boston Children's*, 2025 WL 2607784, at *6. The Requests' scope and the government's response to the petitioner's attempts to narrow that scope show "[t]hat is not the case here." *Id.*

The evidence does not stop there. The government's conduct in this litigation furnishes a firmer foundation to the petitioner. Its supporting declaration was "utterly devoid of specifics." *United States v. Gertner*, 65 F.3d 963, 968 (1st Cir. 1995); *see* ECF No. 10-1 ¶ 6–7 (attesting in conclusory fashion that the Subpoena was part of an FDCA investigation "into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law"). It provided no insight into the identity of any bad actor or the nature of any scheme that might be afoot. Indeed, as noted above, the declaration did not even touch upon all of the elements necessary to sustain a prima facie case in this Circuit. And even a "declaration" that does "touch[] the requisite bases" in a "bareboned" fashion "can come back to haunt the proponent if . . . not . . . supplemented by more hearty fare once the challenger succeeds" in showing pretextual, improper purpose. *Gertner*, 65 F.3d at 968.

Indeed, the government twice made clear that there was no suspicion of any wrongdoing by the petitioner or anyone affiliated with the petitioner. ECF No. 1-3 ¶¶ 4, 6. The government identifies no potential FDCA wrongdoer at all; despite an offhand statement that some unnamed insurance plans may have received claims related to off-label use of puberty blockers or hormones, ECF No. 10 at 1, the government never even "identif[ies] what entities presented

14

insurance plans with such claims." *Seattle Children's*, 2025 WL 3562151, at *11. Such a dearth

of actual suspicion of FDCA wrongdoing, combined with the government's proclamations of its

aim to end gender-affirming care, "make" a "conclusion that the [government's] interest lay *only*

in" its publicly-stated goal "quite plausible." *Gertner*, 65 F.3d at 970.

      If more were needed — and, on this record, it is doubtful that any is — the government's

self-congratulatory statements cinch matters. Six days after the AAG-Civil authorized the

Subpoena, the government issued a press release publicizing its investigation, highlighting the

"more than 20 subpoenas to doctors and clinics involved in performing transgender medical

procedures on children" and including a quote from the Attorney General vowing to hold

"accountable" those "[m]edical professionals and organizations that mutilated children in the

service of a warped ideology." ECF No. 1-13. Less than three weeks later, the White House

crowed about its results in "end[ing] the barbaric, pseudoscientific practice" of gender-affirming

care, listing examples of clinics around the country who had abandoned or suspended such

services. ECF No. 1-14. Conspicuously absent from any of these statements are any mention of

FDCA prosecutions initiated or FDCA-prohibited practices stopped.

      Taken together, then, the evidence "carries more than a whiff of ill-intent." *UPMC*, 2025

WL 3724705, at *2. It paints a compelling picture illustrating that the government's aim is not

actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true

objective of pressuring pediatric hospitals into ending gender-affirming care through

commencing vague, suspicionless "investigations." Every court to consider the issue agrees.

*QueerDoc*, 2025 WL 3013568, at *4–7; *Boston Children's*, 2025 WL 2607784, at *5–7; *Seattle*

*Children's*, 2025 WL 3562151, at *9–13. To countenance such a tactic would be an abuse of the

Court's process.

At this point, a court often convenes an evidentiary hearing to delve further into the government's purpose. *Gertner*, 65 F.3d at 967. "But there is no hard-and-fast rule compelling an evidentiary hearing," *id.*, and the government disavows any need for one. ECF No. 10 at 6 n.2. Given that position and the clarity of the record evidence, there is little purpose in requiring an evidentiary hearing here. *Gertner*, 65 F.3d at 969–70; *see Seattle Children's*, 2025 WL 3562151, at *13 n.9.

The government resists the conclusion of its improper purpose with a multi-pronged defense. But its arguments never grapple with the import of the petitioner's evidence, including the Executive Orders, the Bondi Memo, the Shumate Memo, the government's vague justifications for the Subpoena, or its press releases celebrating the curtailing of gender-affirming care.

Instead, they begin by hinting that the Court should disregard the government's public statements. ECF No. 10 at 6 n.3. But these documents are not campaign statements "made before the President took the oath of office" used to color a "facially neutral" proclamation. *Trump v. Hawaii*, 585 U.S. 667, 702 (2018). To the contrary, the documents obviate the need to "speculat[e] about hidden motives" because they comprise "the Administration's explicit agenda." *QueerDoc*, 2025 WL 3013568, at *5. And where the government has a "self-proclaimed practice" at odds with an investigation's purported purpose, it evinces pretext. *Gertner*, 65 F.3d at 969–70.

Next, citing its ability to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," *Morton Salt*, 338 U.S. at 642–43, the government urges lenient scrutiny of its motives and its investigation's basis. ECF No. 10 at 5.

The suggestion has little to commend it. Properly understood, that language from *Morton Salt* simply means that what was "previously considered to be administrative 'fishing expeditions' are often permitted." *EEOC v. Univ. of N.M.*, 504 F.2d 1296 (10th Cir. 1974). A generic protest that a subpoena lacks probable cause is therefore futile.

But to say that *Morton Salt* requires more obeisance from a reviewing district court fundamentally misunderstands the role of judicial review in administrative-subpoena enforcement. With the advent of the administrative state, judges expressed concern that if administrative subpoena authority was "freed of all restraint upon inquisitorial activities and . . . allowed uncontrolled discretion . . . under the direction of well meaning but over-zealous officials they may at times become instruments of intolerable oppression and injustice." *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 510 (1943) (Murphy, J., dissenting). Thus, to guard against the fear that such authority "may sometimes result in harsh and overzealous action," and "[t]o protect against mistaken or arbitrary orders, judicial review is provided." *Morton Salt*, 338 U.S. at 640.

Indeed, the "justification" for the broad latitude given to the "proposed intrusion" posed by an administrative subpoena "derives from" the fact that "judicial process is afforded before any intrusion occurs." *In re Subpoena Duces Tecum*, 228 F.3d at 348. It requires a court to "question[] the reasonableness of the subpoena's command." *Id.* That means "[a] subpoena 'will be disallowed if it is 'far too sweeping in its terms to be regarded as reasonable' under the Fourth Amendment.'" *Id.* at 349 (quoting *United States v. Calandra*, 414 U.S. 338, 346 (1974)). And "[t]he requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from 'engag[ing] in arbitrary fishing expeditions' and from 'select[ing] targets of investigation out of malice or an intent to harass.'" *Id.* (quoting *United*

*States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)). Judicial review therefore requires an examination of both the investigation's scope vis-à-vis the subpoena's breadth and an evaluation of the motive behind the subpoena.

To be sure, "an enforcement proceeding" is not "an opportunity to test the strength of the underlying complaint." *McLane*, 581 U.S. at 76. And the inquiry into motives is not a plenary one: there is no obligation for the government "to justify its administrative subpoenas by revealing . . . the motives behind a lawful investigation" by providing discovery on the issue. *Whispering Oaks*, 673 F.3d at 818; *see Balanced Fin. Mgmt.*, 769 F.2d at 1445 (teaching that "a substantial preliminary showing" is needed before discovery into motives will be allowed). But none of that "mean[s] that under no circumstances may the court inquire into the underlying reasons for the examination." *Powell*, 379 U.S. at 58. After all, a court must ensure that the subpoena is not "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *Morton Salt*, 338 U.S. at 652. While the government need not affirmatively offer a play-by-play accounting of its investigation or a justification of its motives, ECF No. 10 at 5, where it provides public evidence of its own improper purpose and fails to connect its subpoena to a legitimate investigatory purpose, nothing prevents a court from weighing the import of those facts.

The government pivots. Any examination of its motives, it emphasizes, engenders a "heavy" burden for the petitioner. ECF No. 10 at 6. That is true as far as it goes, but it does not take the government very far.

There is a reason that the burden is often heavy: most of the Department of Justice's investigative work "involves non-public, sensitive matters." Justice Manual § 1-7.100. And the Department of Justice "ordinarily does not confirm or deny the existence of an investigation," *id.*

§ 1-7.410, let alone tip its hand as to its motives. Indeed, ethical obligations sharply curtail prosecutors' ability to speak publicly about their actions without "a legitimate law enforcement purpose" for doing so. Criminal Justice Standard 3-1.10(c) (A.B.A. 2017). A subpoena recipient who suspects ulterior motives is therefore often left only with his suspicions to ground his attack on the subpoena's purpose. Such musings do not suffice even to get discovery, let alone to carry a burden of showing impropriety. *See SEC v. McGoff*, 647 F. 2d 185, 193–94 (D.C. Cir. 1981). But here, the government itself lightened the petitioner's load, supplying its own public statements and listless defense of its investigation as the lever needed to lift that load. *See Gertner*, 65 F.3d at 970. With that assistance provided, the ordinary weight of a petitioner's burden does little to aid the government's cause.

The government has another shot in its sling. Cases declining to find an improper purpose have, it says, cited the lack of an "unstated, nefarious, legally inappropriate reason," *Gomez*, 445 F. Supp. 3d at 1216, but the petitioner points to no such undisclosed reason. ECF No. 10 at 6. The argument exalts hope over reason. For one thing, "such reasons are examples of an improper purpose" in *Gomez*; "the list is not exclusive." *Seattle Children's*, 2025 WL 3562151, at *12. For another, there are no bonus points for "say[ing] the 'quiet parts' out loud." *UPMC*, 2025 WL 3724705, at *2. That the government chose to highlight its improper purpose for public consumption rather than to hide it makes it no less improper.

No matter, the government says. Regardless of any improper purpose present in the evidence, the Attorney General has authorized only "appropriate" investigations, allaying fears of overreach. ECF No. 10 at 6–7.

That is cold comfort. "This logic, if followed, would preclude any form of judicial review as the Government's self-proclaimed say-so would always be sufficient to defeat a motion to

quash." *Boston Children's*, 2025 WL 2607784, at *5. By that logic, an enterprising Executive could announce the compilation of a national gun-owner registry and deploy drug-crime administrative subpoenas indiscriminately for that purpose, *see* 21 U.S.C. § 876, covering its true purpose with the well-worn principle that "firearms" are "tools of the trade . . . for the distribution of illegal drugs," *United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991), and with the caveat that issued subpoenas be "appropriate." Or the Executive Branch could announce an environmental campaign against carbon-producing industries, but try to cover it with the garb of a consumer-protection investigation, *see* 15 U.S.C. § 57b-1, and that same caveat. "This is," of course, "no logic at all." *Boston Children's*, 2025 WL 2607784, at *5. "[A] district court is not a 'rubber stamp' for agency demands for the production of information," *Markwood*, 48 F.3d at 979, and the "*ipse dixit* reasoning" of the government's argument, *QueerDoc*, 2025 WL 3013568, at *5, seeks to transform the Court into exactly that.

In a last-ditch effort to change the trajectory of the debate, the government attempts to reframe the argument as a political one. It characterizes the petitioner's argument as depending on a belief that gender-affirming care should be legal but, because it may "make[] good sense to chart a different course," *United States v. Skrmetti*, 605 U.S. 495, 546 (2025) (Thomas, J., concurring), investigating such care should be deemed "legitimate." ECF No. 10 at 8–9.

As a threshold matter, this misstates the petitioner's position. The petitioner's improper-purpose attack does not depend on an argument that gender-affirming care should be legal; it notes instead that the practice is legal in Colorado, undermining the relevance of investigating fraudulent billing or coding because providers would have no reason to do so. *See* ECF No. 1 at 3, 10–11; *see also* Colo. Rev. Stat. § 10-16-104(3)(b) (requiring "all health benefit plans" to "provide coverage for gender-affirming health care").

The government's argument, in all events, is fishing in an empty stream. This is not a case about transgender rights. *See Children's Hosp. of Phila.*, 2025 WL 3252648, at \*10 (noting that the "task is not to evaluate whether Attorney General Bondi's view . . . is good for our Nation or a fair policy"). Gender-affirming care may be a great idea. *See* Colo. Rev. Stat. § 10-16-104(3)(b). It may be a bad one. *See Skrmetti*, 605 U.S. at 546. But the merits of that debate have nothing to do with the enforcement of an administrative subpoena.

That is because a district court's evaluation of purpose is determining whether the subpoena in question was issued "for a lawfully authorized purpose, within the power of Congress to command." *Walling*, 327 U.S. at 209. Administrative subpoenas are entirely creatures of statute, which Congress creates. *Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d at 690. Thus, "an order of court" compelling compliance with such a subpoena must be "made pursuant to and in exact compliance with authority granted by Congress." *Walling*, 327 U.S. at 196. And the only Congressional authority the government invokes here is its authority to investigate violations of the FDCA. *See* 18 U.S.C. § 3486. Congress has granted no authority to use administrative subpoenas to investigate gender-affirming care, let alone to attempt to end such care through the use of such subpoenas. That — not any political disagreement — is what invalidates the Subpoena.

For that same reason, the government's submission that the Secretary of Health and Human Services also disfavors gender-affirming care, ECF No. 31, is also a non-sequitur. Adding one, two, or a gaggle of Executive Branch officials to the fray makes no difference — it is simply the wrong branch. "All legislative Powers . . . shall be vested in a Congress of the United States," U.S. Const. art I., § 1, including the power to create statutes that vest subpoena authority in executive agencies. The Executive Branch, on the other hand, "shall take Care that

the Laws be faithfully executed." U.S. Const. art. II, § 3. Put more simply, Congress's job is "[p]assin' laws and juggling bills" that could authorize the sort of investigation the government wants to do here; the Executive Branch is "here to see that the laws get done." *Schoolhouse Rock!: Three-Ring Government* (ABC television broadcast Mar. 13, 1979), http:// www.youtube.com/watch?v=pKSGyiT-o3o. Proper "law enforcement" by the Department of Justice, then, requires a "law" justifying its actions.

The short of it is that "the government ought to turn square corners when dealing with its citizens." *Howbert v. Penrose*, 38 F.2d 577, 581 (10th Cir. 1930). Congress has made no law authorizing an investigation of gender-affirming care, let alone one aimed at ending such care. Such an investigation, then, is no faithful execution of any law. Indeed, Colorado law makes such care legal, and "an investigation predicated solely upon legal activity does not pass muster under *any* standard." *Major League Baseball*, 331 F.3d at 1188. The Executive Branch cannot engage in new lawmaking on its own and, thus, until and unless Congress creates a statute justifying it, a purpose of investigating the legal activity of gender-affirming care — let alone ending it — cannot ground a legitimate investigation. The Subpoena must therefore be quashed.

## CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS**[1] that the petitioner's Motion to Quash Subpoena, ECF No. 1, be **GRANTED**.

---

[1] Be advised that all parties shall have fourteen days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive, or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676–83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and

Respectfully submitted this 5th day of January, 2026, at Denver, Colorado.

BY THE COURT:

Cyrus Y. Chung
United States Magistrate Judge

---

recommendations within fourteen days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)). <u>Finally, all parties must consult and comply with the District Judge's practice standards for any specific requirements concerning the filing and briefing of objections.</u>