The Honorable John H. Chun

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| IN RE SUBPOENA DUCES TECUM NO. 25-1431-016 | Case No. 2:25-MC-00041-JHC<br><br>SEATTLE CHILDREN'S HOSPITAL'S NOTICE OF SUPPLEMENTAL AUTHORITY |

NOTICE SUPPLEMENTAL AUTHORITY
CASE NO. 2:25-MC-00041-JHC

CORR CRONIN LLP
1015 Second Avenue, Fl. 10
Seattle, WA 98104-1001
Telephone: (206) 625-8600

# NOTICE OF SUPPLEMENTAL AUTHORITY

Movant Seattle Children's Hospital respectfully submits as supplemental authority *In re 2025 Subpoena to Children's National Hospital*, 2026 WL 160792 (D. Md. Jan. 21, 2026) (**Ex. 1**), which addresses requests in a subpoena issued to Children's National Hospital by the U.S. Department of Justice ("DOJ") under 18 U.S.C. § 3486 that is virtually identical to the subpoena issued to Seattle Children's, *compare Children's Nat'l*, 2026 WL 160792, at *4, *and Children's Nat'l*, 25-cv-3780 (D. Md. Nov. 17, 2025), Dkt. 1-1 at 6, *with* Dkt. 2-1.

Eight families moved to quash Requests 11-13 of the subpoena to Children's National, which seek confidential patient information, as well as all other requests to the extent they call for the production of patient identities and medical records. *Children's Nat'l*, 2026 WL 160792, at *4. The district court granted the motion as to those eight families, concluding (1) "the Subpoena was not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth," and (2) Children's National's patients "have a constitutionally reasonable expectation of privacy in the highly sensitive medical records subject to the Subpoena" that "outweighs any interest of the Government in calling for their production." *Id.* at *8.

RESPECTFULLY SUBMITTED this 28th day of January 2026.

By: *s/ Jeffrey Coopersmith*
Jeffrey Coopersmith
Steven Fogg
**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104
Tel.: (206) 625-8600
Fax: (206) 625-0900
jcoopersmith@corrcronin.com
sfogg@corrcronin.com

David M. Zinn*
Christopher N. Manning*
Jennifer G. Wicht*

NOTICE SUPPLEMENTAL AUTHORITY
CASE NO. 2:25-MC-00041-JHC

**CORR CRONIN LLP**
1015 Second Avenue, Fl. 10
Seattle, WA 98104-1001
Telephone: (206) 625-8600

1  Amy M. Saharia*
   Patrick C. Hynds*
2  Dana B. Kinel*
   **WILLIAMS & CONNOLLY LLP**
3  680 Maine Avenue, S.W.
   Washington, D.C. 20024
4  Tel.: (202) 434-5000
   Fax: (202) 434-5029
5  dzinn@wc.com
   cmanning@wc.com
6  jwicht@wc.com
7  asaharia@wc.com
   phynds@wc.com
8  dkinel@wc.com

9  *admitted pro hac vice

10 *Attorneys for Movant Seattle Children's Hospital*

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# Exhibit 1

Document By **WESTLAW**

2026 WL 160792
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

IN RE 2025 SUBPOENA TO
CHILDREN'S NATIONAL HOSPITAL

Civil No.: 1:25-cv-03780-JRR
|
01/21/2026

**Attorneys and Law Firms**

Donovan C. Bendana, Pro Hac Vice, Boston, MA, Eve Lynne Hill, Brown Goldstein & Levy LLP, Baltimore, MD, Jennifer Levi, Pro Hac Vice, GLBTQ Advocates & Defenders, Boston, MA, for 2025 Subpoena to Children's National Hospital.

Julie R. Rubin, United States District Judge

### MEMORANDUM OPINION

**\*1** Pending before the court is Movants' Motion to Quash Subpoena Duces Tecum.[1] (ECF No. 1; the "Motion.") The court has reviewed all submissions.[2] No hearing is necessary. Local Rule 105.6 (D. Md. 2025).

### I. BACKGROUND

*A. Executive Order 14187:*

*President Trump Orders Gender Affirming Care "Must End."*
On January 28, 2025, President Donald J. Trump issued Executive Order 14187, titled "Protecting Children From Chemical and Surgical Mutilation." Exec. Order No. 14187, *Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025). In it, *inter alia*, President Trump describes gender affirming care as a "stain on our Nation's history" and declares:

"it must end." *Id.* § 1. The Executive Order issues several "Directives to the Department of Justice," including that "[t]he Attorney General shall...prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act[3] by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* § 8. The Executive Order defines "chemical and surgical mutilation" as follows:

> [T]he use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as 'gender affirming care.'

**\*2** *Id.* § 2.

*B. Attorney General Bondi Announces*
*Plan to Effectuate Executive Order 14187.*

In furtherance of the President's Directives, in April 2025, Attorney General Pamela Bondi issued a Memorandum for Select Component Heads with the subject: "Preventing the Mutilation of American Children."[4] Therein, Attorney General Bondi describes gender affirming care as a "radical ideological agenda" rooted in "junk science" and "Hollywood" celebrities; she characterizes administration of such care as "barbaric" and "ruining...children's lives."[5] Attorney General Bondi announces that the purpose of her memorandum is to outline how the U.S. Department of Justice ("DOJ") will effectuate President Trump's Executive Order 14187 that gender affirming care "must end":

President Trump has put a stop to this by issuing his executive order "Protecting Children from Chemical and Surgical Mutilation," signed to halt the exploitation enabled by misguided Biden-era policies. Pursuant to the President's directive, I am issuing the following guidance to all [DOJ] employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents. [6]

Attorney General Bondi's memorandum goes on to announce a multi-faceted plan to fulfill President Trump's policy mandate:

[DOJ] will investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations. To that end:

• I am directing the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." Even if otherwise truthful, the promotion of off-label uses of hormones-including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses-run afoul of the FDA's prohibitions on misbranding and mislabeling.

• I am also directing the Civil Division's Fraud Section to pursue investigations under the False Claims Act [7] of false claims submitted to federal health care programs for any noncovered services related to radical gender experimentation. Examples include but are not limited to physicians prescribing puberty blockers to a child for an illegitimate reason (*e.g.,* gender dysphoria) but reporting a legitimate purpose (*i.e.,* early onset puberty) to the Centers for Medicare & Medicaid Services, and hospitals performing surgical procedures to remove or modify a child's sex organs while billing Medicaid for an entirely different procedure. Falsely billing the government for the chemical or surgical mutilation of a child is a violation of the False Claims Act and is subject to treble damages and severe penalties.

 **\*3**  • I am also notifying the public that the Department is eager to work with *qui tam* whistleblowers with knowledge of any such violations. The False Claims Act allows private citizens to file these actions on behalf of the government against those who have defrauded the government. In meritorious cases, [DOJ] can intervene, and even if the Department takes over the case, the relator may receive a portion of the government's financial recovery. In 2024 alone, qui tam relators received a $344 million share of victories won by the Department. For more information about initiating a *qui tam* action, please visit the Department's website https://www.justice.gov/archives/jm/criminal-resource-manual-932-provisions-handlingqui-tam-suits-filed-under-false-claims-act. [8]

Also relevant is Bondi's announcement of a "coalition" described as follows:

> Federal law enforcement must stand ready to assist states that prioritize children's health over ideology. Accordingly, the Department is launching the Attorney General's Coalition Against Child Mutilation. Through this Coalition, I will partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation and other, related practices. The Department will support the state-level prosecution of medical professionals who violate state laws that protect children, such as Alabama's Vulnerable Child Compassion and Protection Act, which makes it a felony for doctors to treat children with puberty blockers or hormones to affirm a gender identity inconsistent with biological sex. [9]

On June 11, 2025, Assistant Attorney General Brett Shumate issued a memorandum titled "Civil Division Enforcement Priorities" to "All Civil Division Employees." [10] In the memo, Shumate describes the action DOJ's Civil Division will take in furtherance of Attorney General Bondi's April

2025 memorandum to comply with Executive Order 14187. Assistant Attorney General Shumate's memorandum provides in part:

> The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food, Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq.* In addition, the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes. [11]

### C. DOJ Subpoenas Children's National Hospital for Adolescent Patient Records.

Further to President Trump's mandate, and the Bondi and Shumate compliance memos, in June 2025, DOJ issued a subpoena (ECF No. 1-3, the "Subpoena") [12] to Children's National Hospital (the "Hospital") demanding disclosure of Movants' identities and production of their medical records pertaining to transgender healthcare received at the Hospital.

 *4 Movants are eight families, members of which received transgender healthcare through the Hospital's Gender Development Program from January 1, 2020, through (at least) the date of the Motion (November 17, 2025).

(ECF No. 1.) In the Motion, Movants assert the Subpoena lacks a proper investigatory basis and was issued, instead, to pursue the Executive's aim to end and block access to gender affirming healthcare for transgender adolescent patients. Movants urge that the Subpoena violates their Fourth Amendment right to be free from unreasonable search and seizure, and their Fifth Amendment right to privacy in their medical records. Specifically, Movants seek to quash Subpoena Requests 11 through 13, as well as the balance of the Subpoena to the extent such Requests call for production of their identities and medical records.

Subpoena Requests 11, 12, and 13 read as follows:

> Request 11: Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.
>
> Request 12: For each patient identified in Subpoena [Request 11], documents relating to clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.
>
> Request 13: All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks.

(ECF No. 1-1 at p. 6; ECF No. 1-3 at p. 8.) [13]
In opposition to the Motion (ECF No. 15), the United States (the "Government") argues:
1) Movants lack standing; 2) the Motion is "foreclosed" by sovereign immunity; 3) the Motion is time-barred; 4) the Subpoena was issued in furtherance of ferreting out violations of the FDCA, and therefore is not a Fourth Amendment violation; and 5) under Fourth Circuit law, Movants' Fifth Amendment privacy claim "collapses."

## II. ANALYSIS
The court first addresses the Government's jurisdictional and procedural grounds of opposition to the Motion.

### A. Movants Have Standing.
Relying on 18 U.S.C. § 3486, the Government argues that Movants lack statutory standing to move to quash (or

otherwise challenge) the Subpoena because none of them was a recipient of the Subpoena. Section 3486 empowers DOJ to issue administrative subpoenas to investigate federal healthcare offenses and provides as follows in relevant part: "At any time before the return date specified in the summons, the person or entity summoned may" move to quash or modify the subpoena. 18 U.S.C. § 3486(a)(5).

The Government erroneously reads into the statute a prohibition that does not exist, which is to say nothing in the language of the statute prohibits a non-recipient from moving to quash a § 3486 subpoena; further, the Government ignores subsection (a)(7), which expressly incorporates the standards applicable to judicial subpoenas. [14] And that is important. Federal Rule of Civil Procedure 45 provides in relevant part:

> (d) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.
>
> ...
>
> (3) *Quashing or Modifying a Subpoena*
>
> (A) *When Required*. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
> (i) fails to allow a reasonable time to comply;
>
> (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden. FED. R. CIV. P. 45(d)(3)(A)(iv).

 **\*5**  Further, Rule 81 regarding "Applicability of the Rules in General" provides at subsection (a)(5): "These rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." FED. R. CIV. P. 81.

"Ordinarily, a party does not have standing to challenge a subpoena issued to a nonparty unless the party claims some personal right or privilege in the information sought by the subpoena." *U.S. v. Idema*, 118 F. App'x. 740, 744 (4th Cir. 2005). Obviously, production by a hospital of one's private medical records containing highly sensitive treatment and care information rises to the level of potential undue burden as well as disclosure of protected materials contemplated by Rule 45; this appears particularly acute where the records to be disclosed are of a minor who relies on a parent or guardian to protect her interests because she lacks capacity to act in self-protection. *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180 (4th Cir. 2019); *c.f. Mezu v. Morgan State Univ.,* Civ. No. WMN-09-2855, 2011 WL 5110269, at \*2 (D. Md. Oct. 25, 2011), *aff'd*, 495 F. App'x 286 (4th Cir. 2012) (describing as "questionable" whether a party may object to subpoena for third party's medical records, and citing *Idema, supra,* for applicable standard). For the reasons set forth above, the court concludes that Movants meet the statutory/rule-based standard for entitlement to move to quash the Subpoena.

So, too, is the court satisfied that Movants have Article III standing. "The 'irreducible constitutional minimum of standing' requires a plaintiff to show (1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury would likely be redressed by judicial relief." *Fernandez v. RentGrow*, 116 F.4th 288, 294 (4th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). First, the subpoena plainly threatens to cause immediate injury to Movants' default and concrete right to maintain the privacy of their medical records. Second, were the hospital to comply with the Subpoena, or were the Government to disclose or use those medical records for purposes of an investigation of purported FDCA and False Claims Act violations by the Hospital, Movants' privacy interests would be directly and proximately injured; similarly, if the Government had not issued the Subpoena, Movants' would not face the imminent injury about which they complain. Third, Movants' complained of injury to their right to privacy in their medical records is directly redressable by this civil action to quash the Subpoena. Movants, therefore, have both statutory and Article III standing.

**B. *The Government Is Not Protected by Sovereign Immunity.***

Next, the Government argues the Motion is barred by sovereign immunity. The court disagrees.

A "waiver of sovereign immunity must be unequivocally expressed in statutory text" and be "clearly evident from the language of the statute." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (internal quotation marks omitted); *see*

*also Lane v. Pena*, 518 U.S. 187, 192 (1996) (providing waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied"). Here, importantly, Movants seek only equitable relief from Government agency action, which falls squarely within the Administrative Procedure Act's ("APA") waiver of sovereign immunity for suit brought by an individual "suffering legal wrong because of agency action" where the requested relief is "other than money damages." 5 U.S.C. § 702, *Amador v. Mnuchin,* 476 F. Supp. 3d 125, 142 (D. Md. 2020) (citing collection of cases set forth in *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011)).

**\*6** The court notes further that the APA authorizes judicial review of agency action only if "there is no other adequate remedy in a court." 5 U.S.C. § 704; *Amador*, 476 F. Supp. 3d at 142 (citing *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016), and *Bowen v. Massachusetts*, 487 U.S. 879 (1988)). Section 704 embodies the congressional limit on judicial review of agency action such that "the general grant of review in the APA" should not "duplicate existing procedures for review of agency action" or " 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.' " *Bowen*, 487 U.S. at 903 (citation omitted). The Government does not contend the instant action duplicates an existing procedure for review of the challenged agency action taken by DOJ here; nor is the court aware of any other means by which Movants could move to quash or otherwise challenge the Subpoena.

Accordingly, the court is satisfied sovereign immunity does not shield the Government from the Motion.

**C. The Motion Is Not Time-Barred.**
The Government also argues the Motion is untimely because 18 U.S.C. § 3486 authorizes the recipient of an administrative subpoena to move to quash (or modify) prior to the deadline for response, and the Motion was not filed prior to the Subpoena response date. Here, again, the court disagrees with the Government.

Unlike the cases on which the Government relies, Movants were not the recipients of the Subpoena and the Government cites no plausible basis on which to conclude Movants were notified (constructively or in fact) of the Subpoena demanding disclosure of their medical records in advance of the response deadline. "The timeliness argument is disingenuous, given the patients' initial lack of awareness of, and uncertainty regarding, the subpoena." *In re 2025 UPMC Subpoena*, 2:25-mc-01069-CB, 2025 WL 3724705, at \*2 (W.D. Pa. Dec. 24, 2025); *see also In re Motorsports Merch. Antitrust Litig.*, 186 F.R.D. 344, 349 (W.D. Va. 1999) (holding that "failure to act timely will not bar consideration of [certain] objections" to subpoenas on grounds of facial overbreadth)*; Olszewski v. Bloomberg L.P.*, No. 96 Civ. 3393, 2000 WL 1843236, at \*4 (S.D.N.Y. Dec. 13, 2000) (considering motion to quash outside of response date because movant was "entitled to protection from discovery of his confidential health...records"). The court declines to deny the Motion on grounds of untimeliness.

Having satisfied itself that the Motion is properly before the court, the court moves now to the substantive grounds of the Motion. For the reasons set forth below, this court joins the district courts around the country in finding that the Government's Subpoena lacks a proper investigatory purpose under law; serves only to bolster the Executive's policy objective of terminating access to gender affirming healthcare for adolescents; and has no plausible or coherent tether to its stated purpose.

**D. The Subpoena Lacks a Proper Investigative Purpose.**
The Government urges that its power under the Health Insurance Portability and Accountability Act ("HIPAA") to issue § 3486 administrative subpoenas renders the Motion a dead letter. In support of this assertion, the Government cites legislative history of § 3486 that confirms its purpose was to establish a procedure for the Government to " 'make investigative demands' for 'health information about an individual' in health care offense investigations." (ECF No. 15 at p. 19.) To be sure, the Government's administrative subpoena power is broad, but it is not without limit.

In 1950, the Supreme Court made clear that the judicial review hurdle of an administrative agency is not onerous; but neither is an agency's investigatory power boundless. "Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable." *U.S. v. Morton Salt Co.,* 338 U.S. 632, 652-53 (1950) (citations omitted)

**\*7** In 2000, in reviewing a district court's order on a motion to quash an administrative subpoena, the Fourth Circuit held

> In short, an investigative subpoena, to be reasonable under the Fourth Amendment, must be (1) authorized for a legitimate governmental purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific so that a lack of specificity does not render compliance unreasonably burdensome; and (4) not overly broad for the purposes of the inquiry as to be oppressive, a requirement that may support a motion to quash a subpoena only if the movant has first sought reasonable conditions from the government to ameliorate the subpoena's breadth. But a subpoena need not be supported by probable cause....

*In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000)

The Government fails to place before the court any information, record, or evidence supporting or pertaining to investigation of the Hospital for any "health care offense." There is no articulated basis to suspect the Hospital of violations of the FDCA or the False Claims Act; [15] and surely none that would call for disclosure of Movant's records. The Government offers no affidavit (or complaint or whistleblower statement) attesting to grounds for an investigation of the Hospital for FDCA or False Claims Act violation. Instead, the Government offers the Declaration of Lisa Hsiao, Acting Director of DOJ's Enforcement and Affirmative Litigation Branch. Instead of information based on her personal knowledge pertaining to a proper investigation of the Hospital for FDCA violations, Hsiao's Declaration consumes 15 pages of her assertions of what the law is—including assertions of the "overriding purpose of the FDCA," the proper scope of § 3486 affidavits, recitation of how the FDCA is applied, legal definitions of statutory terms, and citation to statutes and case law in support of her description of drug mislabeling and misbranding, and associated harms. [16]

At paragraph 21 of her Declaration, Hsiao describes the focus of DOJ's investigation as follows: "This investigation focuses on prescription drugs typically used in gender-related care for children and adolescents...." Hsiao further attests:

> The Government is aware of credible, publicly available evidence relating to the widespread practice of prescribing cross-sex hormones and puberty blockers to treat gender dysphoria in minors that casts doubt on the safety and efficacy of this practice.
>
> ...
>
> The United States Department of Health and Human Services ("HHS"), of which FDA is a component agency, has determined that the evidence for the safety and efficacy of these drugs for the treatment of gender dysphoria in minors is weak.
>
> ...
>
> The Government is also aware of other major scientific publications and national health authorities that have questioned the strength and quality of the evidence base for the efficacy of puberty blockers and other medical interventions to treat youth for gender dysphoria.

**\*8** (Hsiao Decl., ECF No. 15-1 ¶¶ 22, 24–25)

Nothing in the Government's papers provides even a bare foundation on which to issue the Subpoena requiring adolescent patient medical records. The Government sets forth no basis on which it suspects the Hospital of misbranding or distributing drugs, or any other conduct, as proscribed by the FDCA. The Government's attestation of its general awareness that (or how) certain drugs are applied to patient care across the national healthcare spectrum is "too indefinite" to demand the Hospital produce the medical records described in the Subpoena. *See Morton Salt Co.,* 338 U.S. at 652–53, *supra*. The Government seeks to investigate how the Hospital treats its patients; specifically, in the context of gender-affirming patient care. But the FDCA regulates commerce, not patient care. *In re Subpoena No. 25-1431-014*, Misc Action No. 25-39, 2025 WL 3252648, at \*17 (E.D. Pa. Nov. 21, 2025).

The court concludes the Subpoena was not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth. *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000). Even crediting the Government's stated FDCA investigatory

purpose, such a purpose is at odds with the Subpoena. If the Government is pursuing FDCA violations, it is utterly unclear to this court why the Government demands production of adolescent patient records, including patient names, dates of birth, social security numbers, parent information, clinical indications, diagnoses, and parent authorization forms.[17] Nothing the Government submits plausibly explains the purported connection between the documents it demands and suspected Hospital FDCA violations. Considering the patent disassociation of the scope of the Subpoena from purported investigation of Hospital FDCA violations—against the backdrop of Executive Order 14187, the April 2025 DOJ memorandum, and the June 2025 DOJ memorandum—the court finds the Subpoena is a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare.

### E. Movants Have a Constitutional Right to Expect Privacy of the Medical Records.

There can be no question that Movants have a constitutionally reasonable expectation of privacy in the highly sensitive medical records subject to the Subpoena. *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000). In view of the court's determination that the Government lacks a proper investigative purpose, and, specifically, that the Subpoena demands production of information disconnected from a proper § 3486 subpoena related to investigation of suspected FDCA violations by the Hospital, Movants' interest in maintaining the privacy of their sensitive medical records outweighs any interest of the Government in calling for their production. No proper (never mind compelling) governmental purpose has been demonstrated. *Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021).

### III. CONCLUSION

**\*9** The Government has made improper use of a § 3486 administrative subpoena to out Movants for receiving, and their Hospital for providing, healthcare the Executive characterizes as a "stain on our Nation's history." The Subpoena bears no credible connection to an investigation of any statutory violation by the Hospital. Rather, the Subpoena appears to have no purpose other than to intimidate and harass the Hospital and Movants, and those similarly situated. The Government seeks to fulfill its policy agenda through compliance born of fear. Moreover, in the view of the court, the Subpoena is the classic impermissible fishing expedition.

The court rejects the Government's suggestions that anonymizing Movants' patient records cures the Subpoena's defects. The Subpoena lacks a legitimate purpose. That cannot be ameliorated by providing patient records in redacted form. The court declines, however, to quash the Subpoena for persons other than Movants. Although the Subpoena is an overreach untethered to any lawful purpose no matter who seeks protection from the court, Movants have not persuaded the court that they have standing to raise the matter for persons not parties before the court.

For the reasons set forth herein, the Motion is **GRANTED**. A separate order follows.

/S/

Julie R. Rubin

United States District Judge

January 21, 2026

**All Citations**

Slip Copy, 2026 WL 160792

---

### Footnotes

| | |
|---|---|
| 1 | Movants simultaneously file their unopposed Motion to Proceed Under Pseudonym, to Waive Requirement under Local Rule 102.2(a) to Provide Addresses, and for Protective Order at ECF No. 2 (the "Pseudonym Motion"). Because the court is satisfied that pseudonym use is warranted based on consideration of the factors set forth in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993), the Pseudonym Motion will be granted. This case undoubtedly concerns information of an incredibly sensitive and personal nature—information |

regarding individuals' transgender status and related medical treatment. *See Hersom v. Crouch*, No. 2:21-CV-00450, 2022 WL 908503, at *2 (S.D.W. Va. Mar. 28, 2022) (regarding transgender status); *A.P.G. by Jones v. Fisher-Price, Inc.*, No. 3:22CV112 (DJN), 2023 WL 4406023, at *4 (E.D. Va. July 7, 2023) (regarding minor's medical information). Such information, if revealed, would undoubtedly risk exposure of these minors and their families to harm, including harassment and discrimination. *See Hersom*, 2022 WL 908503, at *2; *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 549 n.14 (D. Md. 2025). Further, here, pseudonym use is to protect the privacy interest of minors, against a government party, where the government neither asserts prejudice nor opposes the Motion. *James*, 6 F.3d at 238. The court will therefore grant the Pseudonym Motion.

2   In addition to the parties' motions papers, the court has considered their submissions of supplemental authority at ECF Nos. 14, 16, and 22.

3   The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301, *et seq.* ("FDCA"). Relevant here, *inter alia*, the FDCA prohibits the "adulteration or misbranding of any...drug...in interstate commerce" and the "delivery or proffered delivery thereof for pay or otherwise." *Id.* §§ 331(a), (e).

4   U.S. OFF. OF THE ATT'Y GEN., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

5   *Id.* at p. 1.

6   *Id.* at p. 3.

7   *See* 31 U.S.C. § 3729 regarding prohibition of submission to the Government of false or fraudulent claims for payment.

8   *Id.* at pp. 4–5 (footnote omitted).

9   *Id.* at p. 5 (footnote omitted).

10  U.S. OFF. OF THE ATT'Y GEN., *Memorandum: Civil Division Enforcement Priorities 2-3* (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

11  *Id.* at p. 1.

12  ECF No. 1-3 is DOJ's subpoena issued to Boston Children's Hospital, which DOJ confirmed to Movants' counsel is "substantively identical" to that served on the Hospital. (ECF No. 1-38, e-mail of Nov. 11, 2025, from Ross S. Goldstein, Assistant Director, DOJ Enforcement & Affirmative Litigation Branch, to co-counsel for Movants, Eve Hill.)

13  Unless otherwise specified, the court's references are to CM/ECF pagination.

14  "A summons issued under this section shall not require the production of anything that would be protected from production under the standards applicable to a subpoena duces tecum issued by a court of the United States." 18 U.S.C. § 3486(a)(7)

15  The Government mounts no argument that the Subpoena was issued in furtherance of an investigation of the Hospital for suspected violation of the False Claims Act, and instead limits its argument to DOJ's interest in purported violations of the FDCA.

16  Indeed, it seems to the court Ms. Hsiao's Declaration is used to exceed the page limit set forth by Local Rule 105.3 without leave of court.

17  Because the scope and breadth of the Subpoena is so mismatched with the Government's articulated purpose, the court strains to imagine how Movants might have comported with the Fourth Circuit's admonition that an overbreadth challenge may be brought "only if the movant has first sought reasonable conditions from the government to ameliorate the subpoena's breadth." *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000). In other words, even if the Subpoena sought only adolescent patient names and social security numbers, or was limited to patient "diagnoses" and physician "assessments," the court strains to see how such a limitation would bring the Subpoena into an appropriate purpose or constitutional scope to investigate potential FDCA violations by the Hospital.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.